# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

KRISTIE FARNHAM, on behalf of herself
and all others similarly situated,

      Plaintiff,

v.

CARIBOU COFFEE COMPANY, INC.,

      Defendant.

CASE NO. 16-CV-00295-wmc

---

## NOTICE OF MOTION AND MOTION FOR
## AWARD OF ATTORNEYS' FEES AND SERVICE AWARD

TO ALL PARTIES AND COUNSEL OF RECORD:

      PLEASE TAKE NOTICE THAT Plaintiff and Class Representative Kristie Farnham and

Class Counsel at Carey Rodriguez Milian Gonya, LLP hereby move for an award of attorneys'

fees and a service award in connection with the class action Settlement Agreement, preliminarily

approved by the Court on July 28, 2017, entered into between Plaintiff and Defendant Caribou

Coffee Company, Inc. ("Caribou").[1]  In support of this motion, Plaintiff and Class Counsel state:

### INTRODUCTION

      The present case is a putative class action in which Plaintiff alleged that Caribou

transmitted text message advertisements to her and the Settlement Class Members' wireless

telephone numbers via an "automatic telephone dialing system" (or "ATDS") without "prior

---

[1]      Unless otherwise defined herein, all capitalized terms have the same force, meaning and effect as ascribed in Section II ("Definitions") of the Settlement Agreement.  Accompanying this Motion are the declarations of Class Counsel at Carey Rodriguez Milian Gonya, LLP, David P. Milian ("Milian Decl."); Frank S. Hedin ("Hedin Decl."); Patrick E. Gonya, ("Gonya Decl."); and Thomas K. Landry ("Landry Decl.").

express written consent," in alleged violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

This litigation was comprehensive and highly contentious. The Parties have collectively prepared and filed two complaints and two answers, a motion to certify the class, a motion to stay, two motions to strike, supplemental briefing on various issues, numerous notices of supplemental authority, joint discovery and pretrial proposals, and a stipulated confidentiality order, among many others things.  The Parties exchanged wide-ranging written and electronic discovery over the course of several months, on both individual merits and class certification-related issues.  Plaintiff served subpoenas on five third parties, from whom she obtained thousands of pages of additional documents and voluminous electronically stored information. Additionally, Plaintiff retained one of the country's leading experts on cellular telephone technology and text message transmission systems to investigate the dialing technology used by Caribou and prepare a report on his findings.  The considerable time and resources Class Counsel invested in this case, despite facing numerous risks of nonpayment at its outset, afforded Class Counsel the opportunity, in advance of ever discussing settlement with Caribou, to meaningfully assess the strength of the class claims and the risks posed by continued litigation.

Settlement negotiations were just as hard fought.  Class Counsel and counsel for Caribou engaged in ten hours of contentious, arms-length negotiations at mediation, during which Class Counsel and Plaintiff negotiated a proposed Settlement that provides meaningful monetary and non-monetary relief to the Settlement Class, in a prompt and efficient manner.  As set forth in the Settlement Agreement, Caribou has agreed to establish a non-reversionary, all-cash Settlement Fund of $8,500,000.00 (eight-million five-hundred thousand dollars), from which all Settlement Class Members who submit a Valid Claim will receive a pro rata share (after Notice and

2

Administration Costs and any attorneys' fee award and service award authorized by the Court are deducted from the Settlement Fund). As the motion for preliminary approval explained, based on typical claims rates and after deducting the estimated Notice and Administration Costs and one-third of the Net Settlement Fund inclusive of costs as an attorneys' fee award, as requested in this motion (assuming the requested fee is granted), each Settlement Class Member who submits a Valid Claim would receive a Cash Award of approximately $200.00.

Additionally, pursuant to the Settlement, Caribou has agreed to: (1) altogether discontinue its text message marketing activities as of the Preliminary Approval Date (and instead market to mobile devices via a downloadable application, which does not implicate the TCPA); and, should Caribou begin transmitting text messages again in the future, (2) implement, and at all times going forward maintain, best practices policies and procedures that fully comply with the TCPA and related FCC regulations; and (3) institute and maintain significant TCPA compliance training of key personnel and enhancements to its systems aimed at preventing the transmission of text messages in violation of the TCPA. The Settlement Notice Program has already resulted in the dissemination of Class Notice directly to over 90% of the Settlement Class, easily satisfying due process and the requirements of Rule 23.

As discussed below, the requested incentive award of $10,000 to Plaintiff is comparable to approved awards to class representatives in similar class action settlements. Similarly, the requested attorneys' fee award of one-third of the Net Settlement Fund inclusive of costs to Class Counsel is in line with the market rate for attorneys' fee awards in similar TCPA class action settlements in the Seventh Circuit, and fairly reflects the result achieved in this case.

## BACKGROUND

### I.     History of this Litigation

On May 5, 2016, following an extensive pre-filing investigation, Plaintiff initiated this action with a class action complaint, alleging claims for negligent and willful violation of the TCPA against Caribou. (ECF No. 1.)  On May 27, 2016, Plaintiff filed a first amended class action complaint (ECF No. 8 (the "Complaint")), the operative pleading.  The Complaint alleges that Caribou violated the TCPA by transmitting text message advertisements to Plaintiff's and the Settlement Class Members' cellular telephone numbers without prior express written consent. Plaintiff alleged receiving approximately fifty (50) such text messages over the course of two months, and further alleged that Caribou sent the texts via an ATDS.

On June 15, 2016, Caribou filed an Answer to the Complaint, asserting the following affirmative defenses: (1) failure to state a claim; (2) lack of standing; (3) lack of causation; (4) failure to mitigate damages; (5) lack of damages; (6) consent; (7) federal preemption; (8) statute of limitations; (9) excessive fines and due process; (10) claims not properly certifiable under Rule 23; and (11) reservation of rights to add additional defenses.  (ECF No. 11.)  On July 2, 2016, Plaintiff filed a motion to strike the affirmative defenses asserted in the Answer pursuant to Federal Rule of Civil Procedure 12(f).  (ECF Nos. 16-17.)

Also on June 15, 2016, Caribou moved to stay the case pending the D.C. Circuit's resolution of *ACA Int'l*, contending that its dialing technology used to transmit text messages lacks the "present capacity" to randomly or sequentially store or produce telephone numbers to be called, and that a favorable decision for Caribou in *ACA Int'l* would thus foreclose Plaintiff's claims for relief. (ECF Nos. 12-13 (the "Motion to Stay").)  On July 1, 2016, Plaintiff filed an opposition to the Motion to Stay, arguing that the decision in *ACA Int'l* cannot possibly impact this case because Caribou's technology constitutes an ATDS under the pre-2015 definition no

4

less than under the 2015 FCC Order. (ECF No. 14.)  Over the following several months, the Parties filed additional briefing and evidence (ECF Nos. 20-23) and numerous notices of supplemental authority (ECF Nos. 26-27, 29-30, 33, 39, 41-43) in support of and in opposition to the Motion to Stay.

On July 6, 2016, Caribou filed an Amended Answer to the Complaint, asserting the following affirmative defenses: (1) lack of standing; (2); lack of damages; (3) lack of causation; (4) failure to mitigate damages; (5) consent; (6) excessive fines and due process; and (7) claims not properly certifiable under Rule 23.  (ECF No. 19.)  On July 24, 2016, Plaintiff filed a motion to strike the affirmative defenses asserted in the Amended Answer pursuant to Federal Rule of Civil Procedure 12(f).  (ECF Nos. 31-32.)

On July 18, 2016, Plaintiff filed a motion for class certification pursuant to Federal Rule of Civil Procedure 23, which was a placeholder motion designed to protect the interests of the class by obviating any risk of Caribou mooting Plaintiff's individual stake in the litigation by depositing funds with the Court equal to or in excess of the maximum value of Plaintiff's claim and having the Court enter judgment in Plaintiff's favor (ECF No. 25).  Plaintiff requested that the Court defer briefing on the motion for class certification until after the completion of class discovery -- a request the Court granted in an Order dated July 19, 2016 (ECF No. 28).

On March 9, 2017, the Court denied Caribou's Motion to Stay without prejudice. (ECF No. 47 n.1 (emphasis added).)

**II.        Settlement Discussions, Mediation and Confirmatory Discovery**

In late-January 2017, the Parties agreed to attend private mediation in an attempt to resolve this case on behalf of the Settlement Class.  On February 8, 2017, the Parties notified the Court that they had agreed to attend mediation, and filed a motion to extend certain discovery

and class certification related deadlines in view of the upcoming mediation, which the Court granted. (ECF No. 45.)

The Parties proposed various different mediators, and after several meet and confers scheduled mediation for April 13, 2017 in Chicago, Illinois before the Hon. Morton Denlow, a well-respected and experienced JAMS mediator and former U.S. Magistrate Judge for the Northern District of Illinois.

In advance of the mediation, Plaintiff's counsel requested, and Caribou's counsel provided, additional documents pertaining to, inter alia, the size and scope of the Settlement Class and various insurance-related information, including letters of declination for each of Caribou's policies.  The Parties also exchanged confidential mediation statements and proposed term sheets ahead of mediation, thoroughly articulating their respective positions on each of the key legal issues relating to liability, class certification and damages exposure.

At mediation on April 13, 2017, the Parties discussed their competing views on various issues, including the relief to which the Settlement Class is potentially entitled, and eventually began exchanging counterproposals on key aspects of the Settlement. Plaintiff's counsel provided a copy of Mr. Snyder's report to Caribou's counsel to review at mediation. The Parties' negotiations were at all times highly adversarial and at arm's length. After ten hours of mediation, the Parties reached an agreement on the principal terms of the Settlement and signed a binding term sheet (subject to confirmatory discovery regarding the total size of the Settlement Class), which the Parties agreed would be used to memorialize the Settlement Agreement and select a Settlement Administrator.

On June 7, 2017, to confirm that the total number of Settlement Class Members provided by Caribou at mediation was accurate, Plaintiff's counsel deposed a representative of Caribou

pursuant to Federal Rule of Civil Procedure 30(b)(6). Through this deposition, Plaintiff's counsel was able to confirm that the total number of Settlement Class Members, i.e., the total number of individuals who received at least one SMS text message from Caribou during the relevant time period, was consistent with the number provided by Caribou at mediation.

Prior to executing the Settlement Agreement, the Parties procured estimates from five (5) reputable and competent professional settlement administrators for the total cost of the Settlement Class Notice Program.  The estimates were prepared by the five settlement administrators based on detailed information provided by the Parties regarding the number of Settlement Class Members, the form of Caribou's records, and the type and extent of contact information Caribou has on file for the Settlement Class Members.  The Parties ultimately selected Epiq, a reputable company with extensive TCPA experience, as the Settlement Administrator. The Settlement Class Notice Program devised by Epiq will provide Notice to Settlement Class Members directly by e-mail and postal mail, by electronic publication and through the Settlement Website, and is estimated to cost $351,756.88, as discussed in detain in the motion for preliminary approval.

Upon completing confirmatory discovery and the selection of the Settlement Administrator, the Parties executed the Settlement Agreement.  The Settlement was thus the product of extensive litigation, a comprehensive formal discovery process, lengthy and arm's length negotiations, confirmatory discovery, and a competitive bidding process resulting in the selection of an experienced Settlement Administrator to effectuate Class Notice.

### III.    Preliminary Approval and the Class Notice Program

On June 12, 2017, Plaintiff filed an unopposed motion for preliminary approval of the Settlement (ECF No. 50), which the Court granted in a written Order dated July 28, 2017 (ECF

No. 54).  Since the date of preliminary approval, the Notice Program has resulted in direct Notice to well over 90% of the Settlement Class.

The deadline for Settlement Class Members to exclude themselves from the Settlement or to object to the Settlement is October 13, 2017, and the deadline to file Claims is November 13, 2017.  The deadline for Settlement Class Members to object to this motion for attorneys' fees and inventive award and for Class Counsel to respond to any objections submitted by Class Members is November 20, 2017.

The final fairness hearing is set for November 27, 2017 at 10:00 a.m.

## ARGUMENT

In light of the tremendous result achieved for the Settlement Class and the market rate for a fee award in this case, the Court should enter an Order (1) approving an incentive award of $10,000 to Plaintiff in recognition of her initiation of and involvement in this litigation; and (2) awarding Class Counsel attorneys' fees equal to one-third of the Settlement Fund (inclusive of out-of-pocket costs) after all Notice and Administration Costs and any incentive award to Plaintiff are first deducted, or $2,712,747.70.

## I.     The Court Should Approve an Incentive Award of $10,000 to Plaintiff

First, the Court should approve an incentive award of $10,000 to Kristie Farnham, the Plaintiff and Class Representative, in recognition of her role initiating this action and her active involvement at each stage of its proceedings.

Service awards compensating named plaintiffs for work done on behalf of the class are routinely awarded. Such awards encourage individual plaintiffs to undertake the responsibility of representative lawsuits. *See Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (recognizing that "because a named plaintiff is an essential ingredient of any class action, an incentive award

8

is appropriate if it is necessary to induce an individual to participate in the suit"); *see also In re Synthroid Mktg. Litig.,* 264 F.3d 712, 722-23 (7th Cir. 2001) ("*Synthroid*").  In deciding whether an incentive award is appropriate and what the amount should be, the Seventh Circuit has advised courts to consider "the actions the plaintiff has taken to protect the interest of the class, the degree to which the class has benefited from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016.

There is ample basis for the Court to approve an incentive award to Ms. Farnham in this case. Ms. Farnham chose to initiate a claim for violation of the TCPA against Caribou on behalf of the Class, retained Class Counsel to represent her and the then-putative Class, provided critical information and extensive electronic and written discovery to Class Counsel at various stages of this case (including in response to Caribou's discovery requests), submitted a declaration in support of a supplemental brief in opposition to Caribou's motion to stay, stayed abreast and in regular communication with Class Counsel concerning the case, and conferred with Class Counsel during settlement negotiations and mediation, and carefully reviewed and then executed the Settlement Agreement. (*See* Milian Decl. ¶ 18.)  But for Plaintiff's initiative and participation in pursuing and prosecuting these claims on behalf of the Settlement Class, it is unlikely that any of the approximately 530,000 Settlement Class Members would have obtained any of the relief provided by the Settlement.

"As for the appropriate amount, district courts in this circuit have awarded incentive fee awards ranging from $5,000 to $25,000." *Johnson v. Meriter Health Servs. Employee Ret. Plan*, No. 10-CV-426-WMC, 2015 WL 13546111, at *4 (W.D. Wis. Jan. 5, 2015) (Conley, J.) (collecting cases).  The requested incentive award of $10,000 falls on the bottom half of this range, and would be consistent with approved incentive awards in similar TCPA class action

settlements in the Seventh Circuit. *See, e.g., Cook*, 142 F.3d at 1016 (affirming $25,000 incentive award to plaintiff); *In re Southwest Airlines Voucher Litig.,* No. 11-8176, 2013 WL 4510197, *11 (N.D. Ill., Aug. 26, 2013) (awarding $15,000 each to two named plaintiffs); *Heekin v. Anthem, Inc.*, No. 05-01908, 2012 WL 5878032, *1 (S.D. Ind. Nov. 20, 2012) (approving $25,000 incentive award to lead class plaintiff over objection); *Will v. Gen. Dynamics Corp.,* No. 06-698, 2010 WL 4818174, *4 (S.D. Ill. Nov. 22, 2010) (awarding $25,000 each to three named plaintiffs); *Benzion v. Vivint, Inc.*, No. 12-61826, DE 201 (S.D. Fla. Feb. 23, 2015) (awarding $20,000 incentive award in TCPA class settlement); *Desai v. ADT Security Servs., Inc.*, No. 11-1925, DE 243 ¶ 20 (N.D. Ill. Feb. 27, 2013) (awarding $30,000 incentive awards in TCPA class settlement).

Accordingly, the requested inventive award of $10,000 to Plaintiff is reasonable and should be approved.

## II.     The Court Should Award Class Counsel One-Third of the Net Settlement Fund, Inclusive of Litigation Expenses, as an Attorneys' Fee Award

Rule 23 provides that "[i]n a certified class action, the court may award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  This is a "common fund" case, meaning that because the defendant is paying a specific sum in exchange for release of liability to all Settlement Class Members, equitable principles permit the Court to "determine[ ] the amount of attorney's fees that plaintiffs' counsel may recover" from the fund "based on the notion that not one plaintiff, but all those who have benefitted from litigation should share its costs."  *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 563 (7th Cir. 1994) (internal citation and quotation marks omitted). When determining whether a requested fee award is reasonable, a court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the

10

interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988).

"In deciding fee levels in common fund cases, we have consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) (quoting *Synthroid*, 264 F.3d at 718); *see also Goodell v. Charter Communications, LLC*, No. 08-cv-512-bbc, 2010 WL 3259349 at *1 (W.D. Wisc. Aug. 17, 2010) (Crabb, J.) (noting that the U.S. Court of Appeals for the Seventh Circuit "has held in a number of cases that when common funds are involved, the district court determines a reasonable fee to be paid out of the common fund, and in doing so, considers the value the marketplace would have assigned to the case at the outset").

Class Counsel's requested fee award of one-third of the Net Settlement Fund (inclusive of out of pocket litigation expenses) fits squarely within the range of market rates for attorneys' fees in TCPA class action settlements of this size, particularly given the significant risk on nonpayment to Class Counsel at the outset and the quality of Class Counsel's representation.

### A. The Court Should Use the Percentage-of-the-Fund Method in Calculating an Appropriate Attorneys' Fee Award

In the Seventh Circuit, district courts may exercise discretion in choosing either the lodestar or percentage-of-the-fund approach to calculating attorneys' fees in connection with class action settlements. *See Florin.*, 34 F.3d at 566.  "The Seventh Circuit is agnostic regarding which approach district courts should choose, and no Seventh Circuit case law suggests that a percentage-of-the-fund approach will yield a reasonable result only where it satisfies a lodestar cross-check." *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 500 (N.D. Ill. 2015) (awarding fees to class counsel as percentage of fund).

In this case, the Court should apply the percentage-of-the-fund approach.  As a threshold matter, the Seventh Circuit has long recognized that where "a class suit produces a fund for the class," as is the case here, "it is commonplace to award the lawyers for the class a percentage of the fund." *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) (affirming award of 38% of $20 million) (citing *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984)); *see also In re Continental Illinois Securities Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) (market for legal services paid on a contingency basis shows the proper percentage to apply in a class action that creates a common fund for the benefit of the class)); *Williams v. Gen. Elec. Capital Auto Lease*, 94 C 7410, 1995 WL 765266, *9 (N.D. Ill. Dec. 26, 1995) (noting that "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred upon the class").

Moreover, in "choosing between the percentage and lodestar approaches," district courts of the Seventh Circuit "look to the calculation method most commonly used in the marketplace at the time such a negotiation would have occurred" *Kolinek*, 311 F.R.D. at 500-01 (citing *Cook*, 142 F.3d at 1013); *see also McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 814-15 (E.D. Wis. 2009).  "When the prevailing method of compensating lawyers for similar services is the contingent fee, then the contingent fee *is* the 'market rate.'" *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 2006).

In both the consumer class action context generally and TCPA class actions specifically, "the normal practice [is] to negotiate a fee arrangement based on a percentage of the plaintiffs' ultimate recovery." *Kolinek*, 311 F.R.D. at 500-01 (choosing to apply percentage-of-fund method); *see also, e.g. Wilder Chiropractic, Inc.*, Case No. 10-CV-229-SLC, Dkt Nos. 63, 67 (W.D. Wisc.) (awarding class counsel attorneys' fees in TCPA class action settlement based using percentage of the total recovery method).  "This is so because fee arrangements based on

the lodestar method require plaintiffs to monitor counsel and ensure that counsel are working efficiently on an hourly basis, something a class of nine million lightly-injured plaintiffs likely would not be interested in doing," *Id.* at 501. Indeed, a fee based on a percentage of the fund is exactly what Class Counsel and Plaintiff agreed to at the outset of this case (Milian Decl. **XX**). *See Assess. Tech. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434, 438 (7th Cir. 2004) ("The best evidence of the value of the lawyer's services is what the client agreed to pay him"). The fee agreement between Class Counsel and Ms. Farnham is a contingency fee arrangement under which Class Counsel would receive 35% of an individual recovery plus the costs of the suit, as well as an additional 5% of the recovery in the event the case were resolved after an appeal. (Hedin Decl. ¶ 8.)

Because a contingency fee is the most commonly used calculation method bargained for at the outset of similar TCPA litigation in the Seventh Circuit, the Court should calculate a fee award in this case based on a percentage-of-the-fund method. *See Cook*, 142 F.3d at 1013; *see also Kolinek*, 311 F.R.D. at 501; *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 795 (N.D. Ill. 2015) (collecting cases).

### B. The Market Rate for a Fee Award in this Case is Between 30% and 36% of the Net Settlement Fund

As discussed below, the market rate for an award of attorneys' fees in a TCPA class action settlement of this size is between 30% to 36% of the Net Settlement Fund, after subtracting Notice and Administration Costs and the incentive award to the class representative. *See Redman v. RadioShack*, 768 F.3d 622, 630 (7th Cir. 2014) (instructing district courts that the "ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received").

"When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Williams*, 658 F.3d at 635.  Although the Seventh Circuit has elucidated "benchmarks" that can assist courts in estimating the market rate, including data from similar cases, the fee contract between the plaintiff and counsel, and information from class-counsel auctions, *see Synthroid*, 264 F.3d at 719, "these are not reliable benchmarks in TCPA class actions like this one," *Kolinek*, 311 F.R.D. at 501, because "data from pre-suit negotiations and class-counsel auctions in TCPA class actions are basically non-existent."  *Id.* (citing *In re Capital One*, 80 F. Supp. 3d at 796; *Wilkins v. HSBC Bank Nev., N.A.*, No. 14 C 190, 2015 WL 890566, at *10 (N.D. Ill. Feb. 27, 2015)).

Generally speaking, the market rate for a fee award in a class action settlement mirrors that of the market contingency fee rate in general litigation, and thus ranges from 30% to 40% of the total benefit made available to the members of the class, plus out of pocket litigation expenses. *See Johnson*, 2015 WL 13546111, at *5 (Conley, J.) (considering, "[a]s a starting point," prior fee awards "approved by other courts in similar large ERISA class actions settlements or other large class action settlements"); *Meyenburg v. Exxon Mobil Corp.*, No. 05-cv-15 DGW, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation"); *see also, e.g., Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005) (approving award of fees equal to 30% of $7.25 million settlement plus $111,054.06 in expenses and citing with approval a submission showing thirteen cases in the Northern District with awards of 30-39% of common funds in class actions); *Gaskill*, 160 F.3d at 361 (awarding 38% of the fund as fees).

In fact, for many years now fee awards of 30% to 40% of the total recovery in common fund TCPA class action settlements have been awarded in the Seventh Circuit, including by the Western District of Wisconsin.  *See, e.g., Bridgeview Health Care Ctr., Ltd. v. Jerryclark*, No. 09 C 5601, 2015 WL 4498741, at *2 (N.D. Ill. July 23, 2015) (awarding one-third of common fund in TCPA class action); *Wilder*, Case No. 10-CV-229-SLC, Dkt Nos. 63, 67 (Judge Crabb awarding class counsel one-third of common fund as attorneys' fees in TCPA class action settlement);

In two recent decisions of the U.S. District Court for the Northern District of Illinois, *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781 (N.D. Ill. 2015) and *Wilkins v. HSBC Bank Nevada, N.A.*, No. 14 C 190, 2015 WL 890566 (N.D. Ill. Feb. 27, 2015), Judge Holderman calculated the market rates for fee awards in the TCPA class action settlement context by thoroughly analyzing numerous empirical studies and prior consumer common fund class action settlements.  In both cases, Judge Holderman concluded that, based on the fee schedule estimated by the Seventh Circuit in *In re Synthroid Marketing Litigation*, 325 F. 3d 974 (7th Cir. 2003) ("*Synthroid II*"), "an *ex ante* negotiation between class counsel and prospective TCPA class members would [have] yield[ed] a downward scaling fee arrangement," *Wilkins*, 2015 WL 890566, at *10; *In re Capital One*, 80 F. Supp. 3d at 803-04, under which class counsel would have received a *base* fee of 30% of the first $10 million recovered for the benefit of the class and a gradually decreasing percentage of each additional $10 million recovered. Numerous federal courts of the Seventh Circuit have since applied the *In re Capital One* framework to calculate the market rate for a fee in TCPA class action settlements of various sizes. *E.g., Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215 (N.D. Ill. 2016); *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 1369741 (N.D. Ill. Apr. 10, 2017);

*Ashack v. Caliber Home Loans, Inc.*, No. 115CV01069JMSDML, 2017 WL 2618885, at *2 (S.D. Ind. June 16, 2017).

This Court should adopt the reasoning of *In re Capital One* and *Wilkins* as well and find that thirty-percent of the Net Common Fund fairly and accurately represents the base market rate for a fee award in an $8.5 million common fund TCPA settlement. *See Kolinek*, 311 F.R.D. at 501 (noting that a thirty percent fee award is not unusual as a base fee in the Seventh Circuit in common fund cases, TCPA or otherwise, in which recovery is less than $10 million, and collecting cases); *see also, e.g., Ashack*, 2017 WL 2618885, at *2 (awarding 30% of common fund in TCPA settlement); *Gehrich*, 316 F.R.D. at 215.

The Court should then consider whether "the risk that class counsel assumed by undertaking class representation" warrants adding a risk premium to the market rate for the fee. *Kolinek*, 311 F.R.D. at 502. The risk factor "is intended to help courts estimate the results of a hypothetical *ex ante* negotiation." *Id.* ("Risk is necessarily a factor in determining the price class counsel would have charged in arm's length *ex ante* negotiations.") (citing *Synthroid* , 264 F.3d at 721 (explaining that "if the market-determined fee for a sure winner were $1 million the market-determined fee for handling a similar suit with only a 50 percent chance of a favorable outcome should be $2 million")). In *In re Capital One*, the court found that class counsel faced significant risk where it was "quite possible that the discovery may have revealed that many class members acquiesced to receiving calls on their cell phones"; "at the outset of the litigation there was a serious question whether the Plaintiffs' claims could meet Rule 23's manageability requirement"; and the FCC was poised to potentially revise its interpretation of the TCPA in such a way as to vanquish plaintiffs' claims. *In re Capital One*, 80 F. Supp. 3d at 805. The court

accordingly applied a six-percent risk premium to the thirty-percent fee award tied to the first $10 million of the settlement fund. *Id.* at 807.

Similarly, in *Kolinek,* the district court calculated the base market rates for fees as 30% of the common fund; found that, consistent with in *In re Capital One*, "the risks imagined by the court in *In re Capital One* were real and significant in the present case;" and concluded "that the market rate for legal services in this TCPA consumer class action, based on the degree of effort the attorneys would need to put in, the likelihood of success, and the risks associated with undertaking class representation, was 36 percent." *Kolinek*, 311 F.R.D. at 502-03 (awarding class counsel "36% of the settlement fund less administrative costs and the incentive award"). Other district courts have likewise awarded 36% of the common fund to class counsel in TCPA class action settlements of $10 million or less. *E.g., Aranda,* 2017 WL 1369741, at *9 (applying *In re Capital One* framework and awarding class counsel 36% of the first $10 million of recovery).

The substantial risk of nonpayment faced by Class Counsel at the outset of this litigation weighs in favor of adding the six-percent premium to the 30% base market rate fee, for a total of 36% of the Net Settlement Fund inclusive of costs.  Class Counsel faced many of the same risks that counsel in *In re Capital One* faced, including the possibility that individualized issues of consent would preclude class certification and that shifting FCC interpretations and rulemakings would absolve the defendant of liability.  But as grave the risk of nonpayment was in *In re Capital One*, the risk of nonpayment to Class Counsel at the outset of this case was graver still. First, the United States Supreme Court's decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) had not yet been released at the time Class Counsel initiated this action (it was released eleven days after the filing of the original complaint), and at the time serious questions existed

concerning the post-*Spokeo* viability of purely statutory damage class actions such as the instant case.  Of course, sixteen months and thousands of *Spokeo* decisions later, the federal judiciary is in nearly uniform agreement that the invasion of privacy inherent in the receipt of an unsolicited call or text message in violation of the TCPA constitutes an injury in fact in and of itself.  *See Griffith v. ContextMedia, Inc.*, 235 F. Supp. 3d 1032, 1035 (N.D. Ill. 2016) (joining "the courts in this district and elsewhere to have concluded that plaintiffs alleging the receipt of specific, unsolicited telephone communications, whether by voice or text message, have Article III standing to pursue TCPA claims based on lost time and invasion of privacy").  However, this was far from clear at the outset or during the first few months of the case.  Thus, the risk that Plaintiff would be found to lack Article III standing presented a substantial risk of nonpayment at the time Class Counsel filed suit.

Second, the appeal of the 2015 FCC Order in *ACA Int'l* was well underway at the time Class Counsel filed suit, presenting yet another major risk of nonpayment at the start. Indeed, the Parties' primary disagreement throughout this case concerned the meaning of the term ATDS. The petitioners in *ACA Int'l* seek an order from the D.C. Circuit vacating the 2015 FCC Order's interpretation of ATDS, which could result in a decision that vacates the 2015 FCC Order and renders Caribou's technology outside the narrower, pre-2015 FCC Order definition of the term; such a scenario would have left Plaintiff and the Settlement Class Members with no cause of action under the TCPA and Class Counsel entitled to no reimbursement of costs or fees.  Oral argument in *ACA Int'l* was held on October 19, 2016, and the D.C. Circuit's decision is imminent.  The pendency of the appeal in *ACA Int'l* at the time of Class Counsel initiated this action, and for the entire duration of the litigation, presented a substantial risk of nonpayment to Class Counsel.

Third, Plaintiff would have faced substantial hurdles on a contested motion for class certification in this case, and a denial of that motion would have left Class Counsel without any recovery of fees. Although the Parties disagree whether the Settlement Class could have been certified, there is no dispute that the Court could easily have denied certification had Caribou been able to present evidence of express written consent for a segment of the Class. *Physicians Healthsource, Inc. v. A-S Medication Sols.*, LLC, 318 F.R.D. 712, 725 (N.D. Ill. 2016) (observing that "[c]ourts determine whether issues of individualized consent defeat commonality and predominance in a TCPA cases on a case-by-case basis after evaluating the specific evidence available to prove consent"); *compare, e.g.*, *G.M. Sign, Inc. v. Brink's Mfg. Co*., No. 09 C 5528, 2011 WL 248511, at *8 (N.D. Ill. Jan. 25, 2011) (denying certification where defendant offered evidence that consent could not be shown with common proof), *and Versteeg v. Bennett, Deloney & Noyes, P.C.*, 271 F.R.D. 668, 674 (D. Wyo. 2011) (declining to certify TCPA class in light of individualized inquiry "into whether each individual gave 'express consent' by providing their wireless number"), *with Savanna Grp., Inc. v. Trynex, Inc*., No. 10-CV-7995, 2013 WL 66181, at *15 (N.D. Ill. Jan. 4, 2013) (granting class certification and rejecting argument that questions of consent caused individual issues to predominate because defendant had not offered evidence that any particular class member consented to the faxes at issue), *and Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 503 (S.D.N.Y. 2014) (holding defendant failed to make a sufficient showing that individualized issues of consent would predominate where defendant failed to keep records of consent), *and Green v. Serv. Master On Location Servs. Corp.*, No. 07 C 4705, 2009 WL 1810769, at *2 (N.D. Ill. June 22, 2009) (explaining that "the question of consent may rightly be understood as a common question and the possibility that some class members may have consented is not sufficient to defeat class certification").

19

Fourth, Caribou asserted an affirmative defense of "excessive fines and due process" in its Amended Answer to the Complaint. (ECF No. 19 at 21 ("Plaintiff's and the proposed class's claim for statutory damages is grossly disproportionate to the conduct alleged, constitutes an excessive fine, and violates Caribou's due process rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.").)  At least some courts view awards of aggregate, statutory damages with skepticism, occasionally going so far as to deny class certification or reduce a class award on due process grounds.  *See, e.g., Aliano v. Joe Caputo & Sons--Algonquin, Inc.*, No. 09 C 910, 2011 WL 1706061, at *4 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case – between $100 and $1,000 per violation – would not violate Defendant's due process rights . . . . Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature."); *Ehren v. Moon, Inc.*, No. 09-21222-CIV, 2010 WL 5014712, at *2 (S.D. Fla. Dec. 3, 2010) ("If class action treatment were applied here, where the complaint contains no indication of any actual damages, the aggregated relief could be oppressive in consequence and difficult to justify.  Certifying a class action in this matter is not superior to other methods of litigation because a class action in this context could raise serious constitutional problems implicating the Defendant's Due Process rights."); *but see, e.g., Phillips Randolph Enterprises, LLC v. Rice Fields*, No. 06 C 4968, 2007 WL 129052, at *3 (N.D. Ill. Jan. 11, 2007) ("Contrary to [defendant's] implicit position, the Due Process clause of the 5th Amendment does not impose upon Congress an obligation to make illegal behavior affordable, particularly for multiple [statutory] violations.").  Thus, had Caribou prevailed on that affirmative defense, available to the company at the outset of the case, any relief potentially available to the Settlement Class could have been significantly reduced or even altogether barred,

thereby reducing or even negating any fee award to which Class Counsel would have otherwise received.

Tellingly, not a single other case related to this action was filed against Caribou, either before or after Plaintiff filed suit, thus suggesting that the high risk nature of these claims made the litigation undesireable to other counsel practicing in this area of law.

Accordingly, the Court should find that a range of between 30% and 36% of the Net Settlement Fund inclusive of costs -- within which the 35% contingency fee agreement between Class Counsel and Plaintiff squarely fits (Hedin Decl. ¶ 8) -- fairly and accurately reflects the market rate for a fee in this case.

### C. An Attorneys' Fee Award of One-Third of the Net Settlement Fund, After First Subtracting Administration Costs and Inclusive of Out of Pocket Costs, Is Fair and Reasonable in this Case

Finally, in determining the appropriate award within that range, or whether a departure from that range is warranted, courts consider such factors as the quality of Class Counsel's representation and the amount of work involved. *See Johnson,* 2015 WL 13546111, at *4-*6. The quality and amount of Class Counsel's work support a fee award of one-third of the Net Settlement Fund inclusive of costs.

### 1. The Quality of Class Counsel's Representation Supports a Fee Award of One-Third of the Net Settlement Fund

First, quality of Class Counsel's representation, in this case and other consumer class action cases, supports an award of on the high end of the market range. *See, e.g., Johnson,* 2015 WL 13546111, at *5 ("[T]he court notes the quality of representation, particularly class counsel's extensive experience in litigating complex ERISA class actions. Although after the fact, the result reached here supports this finding. The $82 million settlement represents a significant victory for the class on the eve of trial in the face of a difficult hurdle in defendants'

statute of limitations defense.")  (citing *Redman*, 768 F.3d at 633 ("We have emphasized that in determining the reasonableness of the attorneys' fee agreed to in a proposed settlement, the central consideration is what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation.")).

Class Counsel, with the assistance of Plaintiff, performed a thorough pre-suit investigation in this case prior to bringing suit on her behalf and that of the then-putative Class. Class Counsel prepared and filed the Complaint; prepared and served a comprehensive preservation demand letter on Caribou and its third party marketing company; filed two motions to strike Caribou's affirmative defenses; negotiated entry of a confidentiality order concerning discovery; and opposed, submitted numerous supplemental briefs and notices of supplemental authority concerning, and ultimately defeated a motion to stay the case pending resolution of *ACA Int'l*.  Additionally, early in the case, when the law was less settled than it is today concerning the ability of a defendant to moot class claims by tendering or serving an offer for full relief, Class Counsel prepared and filed a placeholder motion for class certification designed to prevent against any such scenario.

Although this litigation was hard fought and highly adversarial, Class Counsel and counsel for Caribou and various third parties worked cooperatively in the discovery process in this case for approximately five months, beginning with their Rule 26(f) conference and the preparation of their Joint Discovery Plan and Preliminary Pretrial Report.  Immediately after the temporary discovery stay imposed by the Court expired, the Parties exchanged initial disclosures and Class Counsel served wide-ranging written and electronic discovery requests on Caribou and served subpoenas on five third parties, concerning every aspect of this case, yielding thousands of pages of documents and voluminous electronically stored information relevant to both class

certification and liability.  Class Counsel devoted hundreds of hours reviewing and analyzing these materials in detail and conducting formal and informal follow-up discovery.  Class Counsel worked with Ms. Farnham to respond and object to Caribou's written discovery requests and gather and produce responsive written discovery and ESI to Caribou, and retained one of the country's leading experts on cellular telephone technology and text message transmission systems to investigate the dialing technology used by Caribou and the technological feasibility of managing the case as a class action and to prepare a report on his findings.  Class Counsel had prepared, met and conferred with Caribou regarding, and was on the verge of filing a motion to compel Caribou to produce certain outstanding discovery that, in Class Counsel's view, had been improperly withheld, but agreed to attend mediation to explore a potential class-wide resolution to the case prior to filing the motion.

With the benefit of the information and written discovery Class Counsel obtained from Caribou and various third parties and the expert report prepared by Mr. Snyder, and the invaluable assistance provided by Ms. Farnham at each stage of the case, Class Counsel had a clear view of the strengths and weaknesses of the case and were in a strong position to negotiate a fair, reasonable, and adequate settlement on behalf of the Settlement Class.  In the weeks preceding the mediation (both informally and in a comprehensive mediation statement exchanged with Caribou) and for over ten hours at the mediation itself, Class Counsel negotiated vigorously on behalf of the Class.  The Parties discussed their competing views on various issues, including the relief to which the Settlement Class is potentially entitled, and eventually began exchanging counterproposals on key aspects of the Settlement. Class Counsel provided a copy of Mr. Snyder's report to Caribou's counsel to review at the mediation. The Parties' negotiations were at all times highly adversarial and at arm's length. After ten hours of

mediation, the Parties reached an agreement on the principal terms of the Settlement and signed a binding term sheet (subject to confirmatory discovery regarding the total size of the Settlement Class), which the Parties agreed would be used to memorialize the Settlement Agreement and select a Settlement Administrator.

Class Counsel left no stone unturned in ensuring the interests of the Class were adequately protected between the conclusion of the mediation and the Parties' execution of the formal Settlement Agreement.  On June 7, 2017, to confirm that the total number of Settlement Class Members provided by Caribou at mediation was accurate, Class Counsel deposed a representative of Caribou pursuant to Federal Rule of Civil Procedure 30(b)(6). Through this deposition, Plaintiff's counsel was able to confirm that the size of the Settlement Class, i.e., the number of individuals who received at least one SMS text message from Caribou during the relevant time period, was consistent with the number provided by Caribou at mediation.

Prior to executing the Settlement Agreement, the Parties procured estimates from five (5) reputable and competent professional settlement administrators for the total cost of the Settlement Class Notice Program.  The estimates were prepared by the five settlement administrators based on detailed information provided by the Parties regarding the number of Settlement Class Members, the form of Caribou's records, and the type and extent of contact information Caribou has on file for the Settlement Class Members.  The Parties ultimately selected Epiq, a reputable company with extensive TCPA experience.

As set forth in the Settlement Agreement and discussed above, Class Counsel negotiated a non-reversionary, all-cash Settlement Fund of $8.5 million from which all Settlement Class Members who submit a Valid Claim will receive a pro rata share (after Notice and Administration Costs and any Attorneys' Fee Award and Service Award authorized by the Court

24

are deducted from the Settlement Fund).  Based upon an estimated claims rate of 5%, as typically

seen in cases of this nature, and after deducting the estimated Notice and Administration Costs

and the $10,000.00 incentive award and attorneys' fee award of one-third of the remaining Net

Settlement Fund, each Settlement Class Member who submits a Valid Claim is expected to

receive approximately $200.00 – a sum that far exceeds what claimants typically receive in class

settlements in the TCPA context.[2]  Additionally, the proposed Settlement provides meaningful

prospective relief to the Settlement Class.  Pursuant to the Settlement, Caribou has agreed to: (1)

altogether discontinue its text message marketing activities as of the Preliminary Approval Date

(and instead market to mobile devices via a downloadable application, which does not implicate

the TCPA); and, should Caribou begin transmitting text messages again in the future, (2)

implement, and at all times going forward maintain, best practices policies and procedures that

fully comply with the TCPA and related FCC regulations; and (3) institute and maintain

---

[2]      *E.g., Weinstein v. The Timberland Co., et al.*, No. 06-cv-00484, ECF No. 93 (N.D. Ill. 2008) (approving TCPA class action settlement providing $150.00 cash to each claiming class member); *Desai v. ADT Sec. Servs., Inc.,* Case No. 1:11-cv-01925, ECF No. 229 (N.D. Ill. Feb. 14, 2013) (between $50.00 and $100.00 cash); *Garret, et al. v. Sharps Compliance, Inc.*, Case No. 1:10-cv- 04030, ECF No. 65 (N.D. Ill. Feb. 23, 2012) (between $27.42 and $28.51 cash); *Douglas v. W. Union Co.*, No. 14-CV-1741, 2015 WL 9302316, ECF No. 96 (N.D. Ill. Nov. 10, 2015) ($95.90 cash); *Kolinek v. Walgreen, Co.*, 311 F.R.D. 483, 493 (N.D. Ill. 2015) ($30.00 cash ); *Kazemi v. Payless Shoesource, Inc.*, No. 3:09-cv-05142, ECF No. 94 (N.D. Cal. Apr. 2, 2012) ($25.00 voucher); *Satterfield v. Simon & Schuster, Inc., et al.*, No. 06-cv-2893, ECF No. 132 (N.D. Cal. 2010) ($175.00 cash); *Manouchehri v. Styles for Less, Inc.*, Case No. 14cv2521 NLS, 2016 WL 3387473, at *2, 5 (S.D. Cal. June 20, 2016) ($10.00 cash or $15.00 voucher); *Franklin v. Wells Fargo Bank, N.A.*, Case No. 14cv2349-MMA (BGS), 2016 WL 402249 (S.D. Cal. Jan. 29, 2016) ($71.16 cash); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 3:11-md-02261, ECF No. 97 (S.D. Cal. Feb. 20, 2013) ($20.00 voucher or $15.00 cash); *Estrada v. iYogi, Inc.,* No. 2:13–01989 WBS CKD, 2015 WL 5895942, at *7 (E.D. Cal. Oct. 6, 2015) ($40.00 cash); *Cubbage v. Talbots, Inc.*, No. 09-cv- 00911-BHS, ECF No. 114 (W.D. Wash. Nov. 5, 2012) ($40.00 cash or $80.00 certificate); *Melito v. Am. Eagle Outfitters, Inc.*, No. 1:14-CV-02440-VEC, 2017 WL 366247, at *1 (S.D.N.Y. Jan. 24, 2017) (between $142.00 and $285.00 cash).

significant TCPA compliance training of key personnel and enhancements to its systems aimed at preventing the transmission of text messages in violation of the TCPA.

The Settlement Class Notice Program devised by Epiq at the direction of Class Counsel and counsel for Caribou provided Notice directly to well over 90% of the Settlement Class Members by e-mail or postal mail, and in many cases both e-mail and postal mail, as well as by electronic publication and through the Settlement Website.[3] The estimate of the cost of the entire Program is $351,756.88, and the entire bill will be paid from the Settlement Fund prior to calculation of Class Counsel's requested fee.  The Class Notice Program is comprehensive and was carefully crafted by Class Counsel to protect the due process rights of the Class Members and to maximize the number of monetary awards issued to the Class by providing notice directly to as many Settlement Class Members as possible.

In view of the many difficult hurdles presented by the ATDS issue before the D.C. Circuit, *Spokeo* before the Supreme Court, and Caribou's defenses to class certification, inter alia, the $8.5 million settlement secured by Class Counsel represents an excellent outcome for the Class and speaks highly of the quality of representation in this matter.

---

[3]     When an issue concerning the double-sided postcard notices/claim forms arose during the claims period, Class Counsel worked diligently on behalf of the Class to ensure that all remaining postcards were mailed as quickly as possible and in the most appropriate manner. Class Counsel immediately conferred with Epic and counsel for Caribou concerning the issue, and prepared and filed a Joint Status Report and Emergency Request for Hearing to inform the Court of the issue and seek guidance on how to proceed.  (ECF Nos. 56-57.) With the benefit of prompt guidance from the Court in response, the remaining postcards were successfully produced and mailed to Settlement Class Members three days ahead of the deadline set by the Court and proposed by the parties.  (ECF No. 58.)

## 2. The Substantial Amount of Time and Resources Invested by Class Counsel to this Case Supports a Fee Award of One-Third the Net Settlement Fund

As previously discussed, the fee to Class Counsel in this case should be computed using the percentage of the fund method, not the lodestar method, because no consumer would hire counsel on an hourly basis to prosecute such relatively modest individual claims as those at issue in this case.  And in such a case, "no Seventh Circuit case law suggests that a percentage-of-the-fund approach will yield a reasonable result only where it satisfies a lodestar cross-check," *Kolinek*, 311 F.R.D. at 500 (awarding fees to class counsel in amount of 36% of common fund in TCPA class action settlement without performing lodestar cross-check).

In any event, to the extent the Court finds it necessary to perform a lodestar cross check in this case, or even to use Class Counsel's lodestar to determine an appropriate fee, the significant time and resources Class Counsel invested nonetheless supports an award of the requested one-third of the $8.5 million Settlement Fund (after first deducting a $10,000 incentive award and $351,756.88 administration and notice costs), which equates to $2,712,747.70.

To determine the reasonableness of a requested fee award under the lodestar method, the first step is to "multiply[] a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010).  Class Counsel has submitted, as attachments to Mr. Milian's declaration (Milian Decl. ¶ 15; Ex. A), copies of their detailed time records and expense reports, which reflect that Class Counsel at Carey Rodriguez Milian Gonya, LLP incurred $36,392.81 in out-of-pocket costs and expended 1,021.35 hours of uncompensated attorney time (representing a base lodestar of $520,833.75) over the past year and a half of this case, as depicted in the following chart:

| Timekeeper | Hourly Rate | Number of Hours Expended | Value of Fees |
|---|---|---|---|
| Frank S. Hedin | $450 | 593.30 | $266,985.00 |
| David P. Milian | $625 | 338.50 | $211,593.75 |

| Patrick E. Gonya | $550 | 19.8 | $10,890.00 |
| Thomas K. Landry | $450 | 69.7 | $31,365.00 |
| | | Base Lodestar: | $520,833.75 |

(*See id.*; Milian Decl. ¶ 1-9, 16; Hedin Decl. ¶ 9; Landry Decl. ¶ 8-9; Gonya Decl. ¶ 6.)

The attorney rates listed for Mr. Milian, Mr. Gonya and Mr. Landry are rates that each of those attorneys charges his hourly clients, rendering the rates presumptively reasonable (Gonya Decl. ¶ 3; Milian ¶  3; Landry Decl. ¶ 8-9.) *See Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (finding the attorney's actual billing rate for comparable work to be presumptively appropriate).  Mr. Hedin does not have any hourly clients because he works entirely in the consumer and data privacy class action realm on a contingency basis.  (Hedin Decl. ¶ 11.)  Mr. Hedin's hourly rate of $450 is reasonable because he has for the past several specialized in this nature of consumer class action litigation, previously clerked for a federal district court judge in the Southern District of California, has recently initiated and successfully prosecuted several novel data privacy cases in the biometrics context in district courts of the Seventh Circuit, and has successfully performed most of the substantive legal work on behalf of the Settlement Class in this case.  (*Id.* ¶¶ 2-7.)  *See Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009) (considering factors such as comparable skill, experience and reputation in assessing reasonableness of hourly rate).  As reflected by the detailed billing records accompany Mr. Milian's declaration, the fees and costs incurred by Class Counsel in this case were reasonable and necessary to the successful prosecution of this case on behalf of the Class.  (*See generally* Milian Decl.)  Moreover, Class Counsel also reasonably incurred $36,392.81 in out-of-pocket litigation costs for the benefit of the Class.  (*See id.* ¶ 8.)

Calculating the base lodestar and bill of costs, however, is not the end of the inquiry when performing a lodestar cross-check, because the court must still determine an appropriate

lodestar multiplier to assign as a premium for the services provided.  *See, e.g., Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975-76 (7th Cir. 1991) (remanding case for recalculation of attorneys' fees because the trial court failed to award a risk multiplier).  As when determining the proper percentage of the common fund to award, addressed above, the the risk of non-payment Class Counsel assumed at the time the case was initiated must be considered in determining the proper multiplier, *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 746 (7th Cir. 2011), as must "the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation," *Gastineau*, 592 F.3d at 748; *see also* Richard Posner, Economic Analysis of Law § 21.9, at 534-35 (3d ed. 1986) (explaining it is established  practice to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases).

In this case, the requested award of $2,712,747.70 equates to slightly less than five times (specifically 4.86 times) the total of the base lodestar and expenses of $557,226.56, or slightly greater than five times (specifically 5.20 times) the base lodestar of $520,833.75 by itself.   A multiplier of roughly five times a lodestar is not so unreasonable in this case to warrant deviating from one-third of the Net Settlement Fund, which as discussed above accurately represents the market rate for a fee in light of the risks presented and the results obtained.  Indeed, as this Court has recognized, a fee award representing roughly 5 times the base lodestar is "within the bounds of reason" in the Seventh Circuit in a common fund settlement such as this, *see, e.g., Johnson*, 2015 WL 13546111, at *6 (citing *Williams v. Rohm & Haas Pension Plan*, No. 04-0078-SEB, 2010 WL 4723725 (S.D. Ind. Nov. 12, 2010), *aff'd*, 658 F.3d 629 (7th Cir. 2011)) (noting parenthetically that the court in *Williams* awarded fees of $43.5 million, representing 5.85 multiplier), and in fact is not that much higher than the average multiplier for lodestars in class

action settlements generally, *see In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at *14 (E.D. Pa. Jun 2, 2004) (recognizing that from 2001 to 2003, the *average* multiplier approved in common fund cases was 4.35).

Accordingly, Class Counsel respectfully requests that the Court award one-third of the Net Settlement Fund, inclusive of out of pocket costs, to Class Counsel as attorneys' fees in this case, which would represent a fee in the middle of the market rate.

## CONCLUSION

For the foregoing reasons, Class Counsel respectfully requests an Order awarding attorneys' fees in the amount of $2,712,747.70, or one-third of the common fund, inclusive of costs; and awarding an incentive award to Ms. Farnham in the amount of $10,000.00.

Dated:  September 29, 2017                    Respectfully submitted,

By: /s/  Frank S. Hedin

**CAREY RODRIGUEZ
MILIAN GONYA, LLP**

David P. Milian
Florida Bar No. 844421
dmilian@careyrodriguez.com
Frank S. Hedin
Florida Bar No. 109698
fhedin@careyrodriguez.com
1395 Brickell Avenue, Suite 700
Miami, Florida 33131
Telephone: (305) 372-7474
Facsimile:  (305) 372-7475

*Counsel for Plaintiff*