# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

KRISTIE FARNHAM, on behalf of herself
and all others similarly situated,

       Plaintiff,

v.

CARIBOU COFFEE COMPANY, INC.,

       Defendant.

CASE NO. 16-CV-00295-wmc

---

## PLAINTIFF'S NOTICE OF MOTION AND UNOPPOSED MOTION FOR
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

TO ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT Plaintiff Kristie Farnham hereby moves on an unopposed basis for final approval of the class-wide Settlement Agreement entered into between Plaintiff and Defendant Caribou Coffee Company, Inc. ("Caribou").[1] In support of this motion, Plaintiff states:

## INTRODUCTION

The Settlement provides substantial monetary and non-monetary relief to the Settlement Class. The Settlement requires Caribou to establish a non-reversionary, all-cash Settlement Fund of $8,500,000.00, from which each Settlement Class Members who submitted a Valid Claim will receive a pro rata share (after Notice and Administration Costs and any Attorneys' Fee Award and Service Award authorized by the Court are deducted from the Settlement Fund). The Settlement also requires Caribou to altogether end its SMS text message advertising campaigns

---

[1] Unless otherwise defined herein, all capitalized terms have the same force, meaning and effect as ascribed in Section II ("Definitions") of the Settlement Agreement.

and to instead deliver advertisements to consumers through a downloadable mobile app -- thereby ensuring that members of the Settlement Class receive no further unsolicited text messages from Caribou, while at the same time setting forth a permissible means for Caribou to continue to transmit its advertisements to those consumers who specifically request them.

Given the meaningful monetary and non-monetary relief provided by the Settlement, it is unsurprising that the Settlement Class's reaction to the Settlement has been overwhelmingly positive. Since preliminary approval, the Settlement Administrator has successfully implemented the Court-approved notice plan, contacting hundreds of thousands of members of the Settlement Class by *both* postal mail (via double-sided pre-paid postcards) *and* email, as well as executing an extensive online publication notice campaign. Class Counsel have assisted Settlement Class members with questions and claim forms, worked closely with the Settlement Administrator to ensure that as many members of the Settlement Class as possible received a double-sided post card (in addition to an e-mail notice), and recently requested that the Court prohibit the dissemination of misleading communications to the Settlement Class concerning the procedure for filing a claim. The Settlement Class's approval of the Settlement is reflected by the numbers: Of the 527,816 members of the Settlement Class, 73,703 members filed Valid Claims (representing 13.9% of the Settlement Class, far exceeding the projected 5% claims rate), only 25 members excluded themselves, and only four members filed objections.

The four objections to the Settlement and the requested Attorneys' Fees and Incentive Awards are without merit. One of the objections comes from a Settlement Class member who was misled and convinced to object by a notorious serial objector named Christopher Bandas, who does not have the interests of the Settlement Class in mind, and the other three objections are from Settlement Class members who oppose the entire litigation and argue that the

Settlement Class should receive nothing. None of the objections are bona fide attempts to improve the Settlement for the benefit of the Settlement Class, and they should each be overruled.

When all is said and done (i.e., after the Notice and Administration Costs and the requested Attorneys' Fee Award and Service Award (assuming those requests are granted) are deducted from the $8.5 million Settlement Fund), each Settlement Class Member who submitted a Valid Claim will receive a Cash Award of approximately $75.00.

The settlement represents an outstanding outcome for the Settlement Class, as evidenced by the high level of participation and low levels of opt-outs and objections. As explained more fully below, the Court should not hesitate in granting final approval to the Settlement as it is unquestionably fair, reasonable, and adequate.

## I.    BACKGROUND

This Settlement resolves Plaintiff's claims against Caribou alleging that the company transmitted SMS text messages to members of the Settlement Class without their prior "express written consent," in alleged violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

Plaintiff commenced this litigation on May 5, 2016, following an extensive pre-filing investigation. (ECF No. 1.) Caribou filed, and Plaintiff opposed, a motion stay the case pending the D.C. Circuit's resolution of *ACA Int'l*, in which Caribou argued that its dialing technology used to transmit text messages lacked the "present capacity" to randomly or sequentially store or produce telephone numbers to be called and, as such, a favorable decision for Caribou in *ACA Int'l* would likely foreclose Plaintiff's claims and those of the Settlement Class. The Court ultimately denied Caribou's Motion to Stay. Caribou asserted the following affirmative defenses

to these claims: (1) lack of standing; (2); lack of damages; (3) lack of causation; (4) failure to mitigate damages; (5) consent; (6) excessive fines and due process; and (7) claims not properly certifiable under Rule 23. To protect the interests of the Settlement Class, Plaintiff filed a placeholder motion for class certification to prevent Caribou from attempting to moot her individual stake in the litigation with an offer or tender of judgment.

Class Counsel engaged in substantial discovery concerning every aspect of the Settlement Class's claims. Class Counsel sought voluminous responsive documents, communications and ESI from Caribou, conducted numerous follow-up requests resulting from the their analysis of previously-produced materials, attended several discovery conferences to address objections to particular requests and the sufficiency of certain productions, and sought documents, ESI and other materials via subpoena from various third parties, including Caribou's text marketing affiliates 3Seventy, Inc. ("3Seventy") and Givex Corporation ("Givex"), the wireless telephone carriers Sprint Corporation ("Sprint") and Republic Wireless, Inc., ("Republic Wireless") and an individual formerly employed by Caribou's marketing department -- ultimately obtaining thousands of pages of documents and extremely complex and voluminous ESI that proved critical to evaluating the strength and weaknesses of Plaintiff's case and the likelihood of winning class certification. Plaintiff subsequently retained the assistance of Mr. Randall Snyder, one of the country's foremost experts on automated dialing technology, including automated cellular communication via SMS text message, to prepare a written report regarding, inter alia, the feasibility of identifying Settlement Class Members in Caribou's records and the nature of the technology used by Caribou to deliver its text messages.

As a result of this extensive discovery process, involving the production of materials from Caribou and various third parties and the preparation of an expert report on issues of

importance to liability and class certification, Plaintiff's counsel was in a position to intelligently assess the strengths and weaknesses of the Settlement Class Members' claims and Caribou's defenses.

The Parties attended mediation in this matter on April 13, 2017 in Chicago, Illinois before the Hon. Morton Denlow, a well-respected and experienced JAMS mediator and former U.S. Magistrate Judge for the Northern District of Illinois. In advance of the mediation, Plaintiff's counsel requested, and Caribou's counsel provided, additional documents pertaining to, inter alia, the size and scope of the Settlement Class and various insurance-related information, including letters of declination for each of Caribou's policies. The negotiations at mediation were at all times highly adversarial and at arm's length, and after ten hours of mediation the Parties reached an agreement on the principal terms of the Settlement and signed a binding term sheet.

To confirm that the total number of Settlement Class Members provided by Caribou at mediation was accurate, Plaintiff's counsel deposed a representative of Caribou pursuant to Federal Rule of Civil Procedure 30(b)(6) and confirmed that the total number of Settlement Class Members, i.e., the total number of individuals who received at least one SMS text message from Caribou during the relevant time period, was consistent with the number provided by Caribou at mediation. The Parties then procured estimates from five (5) reputable and competent professional settlement administrators for the total cost of the Settlement Class Notice Program, ultimately selecting Epiq Systems Class Action and Claims Solutions ("Epiq") as the Settlement Administrator.

Upon completion of confirmatory discovery and the selection of the Settlement Administrator, the Parties executed the Settlement Agreement. The Settlement is thus the

product of extensive litigation, a comprehensive formal discovery process, lengthy and arm's length negotiations, confirmatory discovery, and a competitive bidding process resulting in the selection of an experienced Settlement Administrator to effectuate Class Notice.

The Court granted preliminary approval of the Settlement on July 28, 2017, and the final fairness hearing is set for November 27, 2017.

## II.    TERMS OF THE SETTLEMENT

The terms of the Settlement preliminarily approved by the Court are set forth in the Parties' Settlement Agreement and are briefly summarized below:

### A.    Class Definition

The preliminarily certified Settlement Class is defined as:

> All Persons who, while residing in the United States, received one or more text messages sent by or on behalf of Caribou Coffee Company, Inc. at a cellular telephone number between May 5, 2012 and July 28, 2017.
>
> (i)    Specifically excluded from the Settlement Class are the following Persons:
>
> > a.    Caribou Coffee Company, Inc., and its affiliates, employees, officers, directors, agents, and representatives and their immediate family members;
> >
> > b.    Class Counsel;
> >
> > c.    Any person who first received a text message from Caribou Coffee Company, Inc. after July 28, 2017 and;
> >
> > d.    The Judge and U.S. Magistrate Judge who have presided over the Litigation and their immediate family members.

(Settlement Agreement § III.A; ECF No. 54 at 4-5 (Order granting preliminary approval).)

### B. Monetary Relief

Caribou will pay, on a non-reversionary basis, cash in the amount of $8,500,000.00 to create the common Settlement Fund, from which all claiming Settlement Class members will be paid a pro rata Cash Award, after first deducting all Settlement costs, including the Notice and Administrative Costs, and any Attorneys' Fee Award and Service Award awarded by the Court. (*Id.* § IV.A-B.)[2]   No portion of the Settlement Fund shall be returned or refunded to Caribou. (*Id.* § IV.A, F.)

### B. Prospective Relief

Caribou has agreed to provide substantial prospective relief to Settlement Class members by implementing significant changes to its consumer marketing practices going forward, which will ensure that no text messages are transmitted to Settlement Class Members absent prior their express written consent.   (*Id.* § IV.C.)   Specifically, Caribou has (1) discontinued its text message marketing program as of July 28, 2017 (and will now instead offer its customers access to discounts and information through a downloadable application, which does not implicate the TCPA); and, should Caribou elect to restart a text marketing program in the future, (2) implement, and at all times going forward maintain, best practices policies and procedures that fully comply with the TCPA and related FCC regulations; and (3) institute and maintain

---

[2]      Any unclaimed funds will be distributed via subsequent distribution(s) to approved claimants to the extent the uncashed check funds allow for subsequent distribution of Cash Awards of $1.00 or more per claimant, after administration costs, and to the extent otherwise feasible.  (Settlement Agreement § IV.F.)  In the event uncashed check funds are of an amount that does not allow for a subsequent distribution of Cash Awards of $1.00 or more per claimant, after administration costs, or if it is otherwise infeasible to distribute uncashed check funds in the Settlement Fund, then the remaining uncashed funds shall be distributed as directed by the Court upon application made by Settlement Class Counsel and Defense Counsel for such funds to be distributed to a charitable organization, selected by the Parties, concerned with consumer protection issues of the general character presented by this case, such that the charitable organization's work coincides, or at least overlaps, with the interest of the Settlement Class. *Id.* Under no circumstances shall any money in the Settlement Fund revert to Caribou.  (*Id.*)

significant TCPA compliance training of key personnel and enhancements to its systems aimed at preventing the transmission of text messages in violation of the TCPA. (*Id.*)

### C. Notice and Settlement Administration Costs

Caribou has agreed to pay from the Settlement Fund all Notice and Administration Costs to the Settlement Administrator, i.e.., the costs of effectuating the Court-approved Notice Program, as well as all expenses incurred by the Settlement Administrator in processing and paying Valid Claims and otherwise administering the Settlement. (*Id.* § IV.D-E.) The Settlement Administrator initially estimated that the total Notice and Administration Costs would be $351,756.88, but recently advised Class Counsel that the total costs and expenses has since increased given the higher than expected claims rate and associated costs of processing more claims and remitting more Cash Awards. Class Counsel has requested from Epiq, and will provide the Court by the final fairness hearing on November 27, 2017, the total Notice and Administration Costs incurred administrating the Settlement.

### D. Service Award for Class Representative and Attorneys' Fees for Class Counsel

Caribou has agreed to pay from the Settlement Fund, subject to Court approval, a reasonable Service Award to Plaintiff in recognition of the time and effort she expended in pursuing this action and in fulfilling her obligations and responsibilities as class representative. (Settlement Agreement § VI.A.) Caribou has also agreed to pay from the Settlement Fund a reasonable Attorneys' Fee Award to proposed Class Counsel, as may be awarded by the Court. (*Id.* § VI.B.)

Plaintiff filed a motion for a Service Award and an Attorneys' Fee Award to Class Counsel, and published a copy of that motion on the Settlement Website. Plaintiff requested a total fee and expense award to Class Counsel of one-third of the net Settlement Fund after all

Notice and Administration Costs are first deducted, inclusive of costs expended by Plaintiff's counsel, and an incentive award to Plaintiff of $10,000.00.

### E. Release of Liability

In exchange for the monetary and prospective relief described above, each Settlement Class member will be deemed to have released and forever discharged Caribou (along with its third-party text message marketing affiliates 3Seventy and Givex) from any and all claims arising from or relating to allegedly unauthorized text messages sent by Caribou to members of the Settlement Class (as set forth in Section X of the Settlement Agreement) – except that no claims of Settlement Class members who timely and properly request exclusion will be released, as set forth in the Settlement Agreement. (*Id.* § X; *see also id.* § VII.D-E (concerning opt-outs).)

## III. THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS

Prior to granting final approval to this Settlement, the Court must first consider whether the Notice to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011). The "best notice practicable" does not require receipt of actual notice by all Settlement Class members in order to comport with both Rule 23 and the requirements of due process, but it often includes, as in this case, direct notice to individuals who can be identified by regular mail. *See Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification"). Class members who cannot be identified through reasonable effort can be notified by publication. *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013).

The multi-part Notice Plan approved by the Court in this case has been implemented by Court-approved Settlement Administrator, Epiq Systems Class Action and Claims Solutions, and included robust direct notice and electronic publication notice. (*See* Declaration of Cameron Azari, filed concurrently herewith.) Direct notice was provided to every Settlement Class member who could be identified in Caribou's records (or through reasonable effort using reverse lookup databases) via both electronic and regular mail. To that end, the Settlement Administrator mailed 503,900 direct postcard notices with Claim Forms (return postage pre-paid) to Settlement Class members. (Azari Decl. ¶ 12.) Additionally, the Settlement Administrator sent email notice to each of 477,850 Settlement Class members who had an e-mail on file. (*Id.* ¶ 17.) Ultimately, notice was individually delivered to a remarkable 99% of the names and addresses associated with the telephone numbers in Caribou's records and was thus eminently reasonable (*Id.* ¶ 18). *See* Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain Language Guide 3* (2010) (concluding that a notice plan that reaches at least 70% of the class is reasonable).

The Notice Program also included electronic publication notice. Noticed was published on the *Yahoo Ad Network* via banner advertisements, delivering over 10 million impressions on both a national and geo-targeted basis. (Azari Decl. ¶¶ 19-20.) To facilitate locating the Settlement Website, sponsored search listings were also acquired on the three most highly-visited Internet search engines: *Google, Yahoo!* and *Bing*, resulting in 1,846 clicks that displayed the Settlement Website. (*Id.* ¶ 22.)

Finally, the required notice was sent to the Attorney General of the United States as well as the Attorneys General of all 50 states, the District of Columbia and the U.S. Territories. (*Id.* ¶¶ 9-10.)

All of these notices directed Settlement Class members to the Settlement Website (www.CaribouCoffeeTCPASettlement.com), which provided the Notice and important Court documents (including the Settlement Agreement) to Settlement Class members, as well as the ability to download and submit Claim Forms online. (*Id.* ¶¶ 23-24.) Additionally, during the entirety of the Notice Program, the Class Administrator has also maintained a toll-free telephone number for members of the Settlement Class to request claim forms or obtain more information about the Settlement. (*Id.* ¶ 25.) 82,217 people visited the settlement website, over 1,017 calls were made to the toll-free number.

All told, 73,703 Valid Claims were submitted, representing a remarkable 13.9% of the Settlement Class. (*Id.* ¶¶ 24-27.) Only 25 Settlement Class members excluded themselves and only four objected. (*Id.* ¶ 31.)

Accordingly, there can be no dispute that the members of the Settlement Class received the best notice practicable under the circumstances. The individual notice by *both* postcard *and* email for nearly all Settlement Class members, combined with the electronic publication notice, far surpasses the minimum requirements of due process and Rule 23, as evidenced by the outstanding claims rate in this case.

## IV.     THE SETTLEMENT DESERVES FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) mandates that "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval . . . after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, Nos. 07 CV 2898, 09 C 2026., 2012 WL 651727, at *1 (N.D. Ill. Feb. 28, 2012), *appeal dismissed*, *Safeco Ins. Co. of Am. v. Am. Int'l Grp.*, 710 F.3d 754 (7th Cir. 2013). Even so, "[f]ederal courts naturally favor the settlement of class action litigation." *Schulte*, 805 F. Supp. 2d at 578 (citing *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)). Given this

predisposition towards settlement, the Court's approval inquiry "is limited to [consideration of] whether the settlement is lawful, fair, reasonable and adequate." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002).

The Seventh Circuit has identified five factors for district courts to consider in determining whether to approve a class action settlement: (i) the strength of a plaintiff's case compared to the amount of the defendant's settlement offer; (ii) an assessment of the likely complexity, length and expense of the litigation; (iii) an evaluation of the amount of opposition to the settlement among affected parties; (iv) the opinion of competent counsel; and (v) the stage of the proceedings and amount of discovery completed at the time of settlement. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (citation and internal quotations omitted); *accord In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) (hereinafter "*In re AT&T II*"). In addition to these factors, district courts of the Seventh Circuit also consider whether the settlement is the product of collusion, or whether there are otherwise any "red flags" present in the settlement that would suggest it is unfair to the class. *Eubank v. Pella Corp.*, 753 F.3d 718, 723-29 (7th Cir. 2014).

Each of these factors overwhelmingly weighs in favor of granting final approval to the Settlement.

### A. The Value of the Settlement in View of the Risks Posed by Continued Litigation Favors Final Approval of the Settlement.

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel*, 463 F.3d at 653 (internal quotes and citations omitted).

The strength of a plaintiff's case can be quantified by examining "the net expected value of continued litigation to the class" and then estimating "the range of possible outcomes and

ascrib[ing] a probability to each point on the range." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *2 (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002) and *Synfuel*, 463 F.3d at 653); *see also Eubank*, 753 F.3d at 727 (finding that the district court should "estimate the likely outcome of a trial . . . in order to evaluate the adequacy of the settlement"). However, "[t]he Seventh Circuit has recognized that valuing hypothetical continued litigation is necessarily speculative and therefore an inexact science," and courts need only "estimate and come to a ballpark valuation" of the class's claims. *Kolinek v. Walgreen, Co.*, 311 F.R.D. 483, 503 (N.D. Ill. 2015) (citation and internal quotations omitted); *see also In re Southwest Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) ("In considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval."). Ultimately, because a settlement is a compromise, "courts need not—and indeed should not—'reject a settlement solely because it does not provide a complete victory to the plaintiffs.'" *In re Capital One Telephone Consumer Protection Act Litigation*, 80 F. Supp. 3d 781, 790 (N.D. Ill. 2015) (quoting *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (hereinafter "*In re AT&T I*")). "This is especially true when complete victory would most surely bankrupt the prospective judgment debtor." *Id.* (pointing out that in TCPA cases involving millions of class members and phone calls, potential TCPA liability often reaches into the billions if not trillions of dollars).

In this case, the amount offered in the Settlement – $8.5 million – is substantial. And while Plaintiff continues to believe that her claims against Caribou have merit, there are a number of legal uncertainties associated with continued litigation that pose substantial risk of non-recovery to the Settlement Class. *See In re Southwest Airlines Voucher Litig.*, No. 11-cv-

8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) ("In considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval.").

First, the D.C. Circuit will decide *ACA Int'l* any day now, and its decision on the meaning of the term "automatic telephone dialing system" could have, absent the Settlement, left the Settlement Class with no cause of action under the TCPA and thus entitled to no relief.  Second, if the Settlement had not been reached, Caribou would have had a reasonable chance of defeating class certification on the ground that individual issues among Settlement Class members predominate on the key issue of consent.[3]  *In re Capital One*, 80 F. Supp. 3d at 790 (approving TCPA class action settlement, and explaining adequacy and fairness of relief as follows: "[A]t a trial, Plaintiffs would have the burden to effectively rebut Capital One's chief defense that the

---

[3]     Plaintiff's entire theory of class-wide liability in this case hinged on certain ambiguities that Plaintiff believed existed in the Caribou Perks loyalty program records reflecting the text message opt-in settings of its members.  Caribou disputed Plaintiff's interpretation of these records and argued throughout this litigation and at mediation that the records constituted "express written consent" of the members of the Settlement Class.  It is possible, although unlikely that the Court would have disagreed with Plaintiff and agreed with Caribou on this key issue, in which case the Court would likely have denied class certification and the Settlement Class would have recovered nothing.  *Physicians Healthsource, Inc. v. A-S Medication Sols.*, LLC, 318 F.R.D. 712, 725 (N.D. Ill. 2016) (noting that "[c]ourts determine whether issues of individualized consent defeat commonality and predominance in a TCPA cases on a case-by-case basis after evaluating the specific evidence available to prove consent"); *compare, e.g.*, *G.M. Sign, Inc. v. Brink's Mfg. Co*., No. 09 C 5528, 2011 WL 248511, at *8 (N.D. Ill. Jan. 25, 2011) (denying certification where defendant offered evidence that consent could not be shown with common proof), *and Versteeg v. Bennett, Deloney & Noyes, P.C.*, 271 F.R.D. 668, 674 (D. Wyo. 2011) (declining to certify TCPA class in light of individualized inquiry "into whether each individual gave 'express consent' by providing their wireless number"), *with Savanna Grp., Inc. v. Trynex, Inc*., No. 10-CV-7995, 2013 WL 66181, at *15 (N.D. Ill. Jan. 4, 2013) (granting class certification and rejecting argument that questions of consent caused individual issues to predominate because defendant had not offered evidence that any particular class member consented to the faxes at issue), *and Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 503 (S.D.N.Y. 2014) (holding defendant failed to make a sufficient showing that individualized issues of consent would predominate where defendant failed to keep records of consent), *and Green v. Serv. Master On Location Servs. Corp.*, No. 07 C 4705, 2009 WL 1810769, at *2 (N.D. Ill. June 22, 2009) (explaining that "the question of consent may rightly be understood as a common question and the possibility that some class members may have consented is not sufficient to defeat class certification").

class members' consented to be contacted on their cell phones. Capital One argues that it obtained consent to call from each class member because every version of Capital One's standard cardholder agreement contained provisions expressing that Plaintiffs consented to receive calls through an autodialing technology. Plaintiffs admit that they agreed to the terms of their cardholder agreements, but argue they did not agree to be contacted 'in violation of the TCPA.' Many class members, however, even provided their cell phone numbers to Capital One as their primary contact numbers. Under an FCC order in 2008 implementing the TCPA, autodialed collection calls to 'wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express consent' of the called party,' and are therefore permissible."). Third, Caribou's affirmative defense of "excessive fines and due process" in its Amended Answer to the Complaint could have resulted in the Court denying class certification or reducing any award to the Settlement Class on due process grounds. *See, e.g., Aliano v. Joe Caputo & Sons--Algonquin, Inc.*, No. 09 C 910, 2011 WL 1706061, at *4 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case – between $100 and $1,000 per violation – would not violate Defendant's due process rights . . . . Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature.").

Even if Plaintiff did win class certification, Plaintiff might still have lost at trial. *See Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 739 (N.D. Ill. 2014) ("[T]he reality known to first year law students [is] that juries are inherently unpredictable, and there is no such thing as a sure winner either in pretrial proceedings or at trial.") (internal citation omitted). And even assuming Plaintiff prevailed at trial, any judgment would be susceptible to reversal on appeal and, even if the judgment were affirmed, any large class-wide damages award "would

most surely bankrupt the prospective judgment debtor." *In re Capital One*, 80 F. Supp. 3d at 790. A pyrrhic victory for the Settlement Class at trial would have been in no one's interest. The Settlement, by contrast, provides substantial and guaranteed monetary and non-monetary relief to all Settlement Class members, in a timely and efficient manner.

The $8.5 million Settlement is, by any reasonable measure, an excellent result for the Settlement Class, particularly in view of the risks of continued litigation. Accordingly, the first and most important factor weighs in favor of finding the Settlement fair, reasonable and adequate. *See Schulte v. Fifth Third Bank*, No. 09-CV-6655, 2010 WL 8816289, at *3 (N.D. Ill. Sept. 10, 2010) (where a "settlement appears relatively generous when compared to settlements in analogous circumstances[, it] is sufficient to satisfy the standard for *preliminary* approval") (emphasis in original).

**B. Continued Litigation Would Be Complex, Costly and Lengthy**

Final approval is also favored in cases such as this where "[s]ettlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte*, 805 F. Supp. 2d at 586.

If this litigation were to continue, it would be lengthy and very expensive and involve extensive motion practice, including a motion for class certification (and possibly a motion for decertification), motions for summary judgment and various pretrial motions, as well as the retention of additional experts, preparation of expert reports, and expert depositions. *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("[C]lass action suits have a well deserved reputation as being most complex."). The case would probably not go to trial for over a year. And even if the Settlement Class were certified and to recover a judgment at trial in excess of the

$8.5 million provided by the Settlement, post-trial motions and the appellate process would deprive them of any recovery for years, and possibly forever in the event of a reversal.

Moreover, in the Court of Appeals, the members of the Settlement Class would risk not only the loss of a jury verdict, but also decertification and possible dismissal for lack of Article III standing. While the federal judiciary is presently in near uniform agreement that the privacy invasion inherent in a violation of the TCPA gives rise to a concrete injury under Article III, *see, e.g.*, *Van Patten v. Vertical Fitness Grp, LLC*, — F.3d —, No. 14-55980, 2017 WL 460663, at *4 (9th Cir. Jan. 30, 2017) ("Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients. A plaintiff alleging a violation under the TCPA 'need not allege any *additional* harm beyond the one Congress has identified.'"), there is nevertheless a risk that either the Seventh Circuit or the Supreme Court would disagree. And although the federal government has historically defended the constitutionality of the TCPA, *see, e.g.*, United States of America's Memorandum in Support of the Constitutionality of the Telephone Consumer Protection Act of 1991, *Holt v. Facebook, Inc.*, No. 3:16-cv-02266, Dkt. 48 (N.D. Cal. October 17, 2016), the current administration's stance on the statute is unknown.

If anything, "this drawn-out, complex, and costly litigation process . . . would provide [Settlement] Class [m]embers with either no in-court recovery or some recovery many years from now . . . ." *In re AT&T II*, 789 F. Supp. 2d at 964. Rather than embarking on years of protracted and uncertain litigation, Plaintiff and Class Counsel negotiated a Settlement that provides immediate, certain, and *meaningful* relief to all Settlement Class Members. *See Schulte*, 805 F. Supp. 2d at 586. The second factor weighs in favor of granting final approval of the Settlement. *See Borcea v. Carnival Corp.*, 238 F.R.D. 664, 674 (S.D. Fla. 2006) (noting that

"[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush").

### C. Class Counsel Is Competent, Well-Informed and Experienced, and Strongly Endorses the Settlement

The third factor examines the opinion of competent counsel as to whether the Settlement is fair, reasonable, and adequate. *Isby*, 75 F.3d at 1200; *see also Schulte*, 805 F. Supp. 2d at 586 ("The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23.").

Class Counsel, David P. Milian and Frank S. Hedin of Carey Rodriguez Milian Gonya, LLP, have significant experience in consumer privacy class action litigation, and have been appointed and served as class counsel in a similar TCPA case involving the transmission of allegedly unsolicited text message advertisements. Both Mr. Hedin and Mr. Milian strongly endorse the Settlement. Class Counsel negotiated the Settlement at arm's length before an experienced mediator after engaging in substantial discovery, and believe that it provides significant relief for individuals who would otherwise be left without a remedy.

Accordingly, the third factor weighs in favor of finally approving the Settlement. *See, e.g., McKinnie v. JP Morgan Chase Bank, N.A.,* 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator . . . suggest that the settlement is fair and merits final approval."); *see also In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys"); *Hispanics United v. Vill. Of Addison*, 988 F. Supp. 1130, 1150 n.6 (N.D. Ill. 1997) (noting that a "strong initial presumption of fairness attaches" where the settlement is "the result

of arm's length negotiations," and where plaintiff's counsel are "experienced and have engaged in adequate discovery").

### D. The Settlement Was Reached After Significant Litigation, Wide-Ranging Discovery and Arm's Length Negotiations

The fourth factor concerns the stage of the proceedings and amount of discovery completed at the time the settlement is reached. *Synfuel*, 463 F.3d at 653. This factor is significant because "it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Am. Int'l Grp., Inc.*, 2011 WL 3290302, at *2 (internal quotations omitted). It is satisfied where "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough." *Isby*, 75 F.3d at 1200 (citation and internal quotations omitted).

The Settlement was reached after nearly a year of hard-fought litigation and was informed by Class Counsel's thorough review and analysis of significant amounts of documents and ESI produced by Caribou and several third parties, concerning every aspect of this case. Plaintiff's counsel additionally retained an expert to investigate and prepare a report concerning Caribou's dialing technology and the feasibility of identifying Settlement Class Members in Caribou's records. Armed with this information, Plaintiff and her counsel had "a clear view of the strengths and weaknesses" of the case and were in a strong position to negotiate a fair, reasonable, and adequate settlement on behalf of the Settlement Class at mediation. *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd* 798 F.2d 35 (2d Cir. 1986). Mediation was also hard-fought. The Parties reached an agreement in principle after ten hours of extensive negotiations with the assistance of Judge Denlow, and Plaintiff only executed the Settlement Agreement after confirming the size of the Settlement Class by deposing a Caribou representative.

Because the Settlement is the product of "arm's length negotiations between experienced counsel after significant discovery ha[s] occurred, the Court may presume the settlement to be fair, adequate, and reasonable." *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006) (citations omitted); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 WL 3290302, at *8 (N.D. Ill. July 26, 2011) ("extensive discovery has undisputedly been completed . . . and it is impossible to say that the court and the parties are unable to evaluate the merits of this case"); H. Newberg, A. Conte, Newberg on Class Actions § 11.41 (4th ed. 2002) (presumption of fairness exists where a proposed class settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experienced.").[4]

Accordingly, the stage of the proceedings and amount of discovery completed also weigh in favor of final approval.

### E. The Settlement is Not a Product of Collusion and There are No "Red Flags" Present

Although not a factor specifically set forth in *Synfuel*, district courts of the Seventh Circuit also consider whether a settlement is the product of collusion, and whether there are any "red flags" to suggest that the settlement is unfair to settling class members. *Eubank*, 753 F.3d at 722-29. Examples of the "red flags" described in *Eubank* include (i) the failure to properly establish the size of the fund and the total class recovery, (ii) the reversion of unawarded attorneys' fees to the defendant, (iii) substantial alterations to existing class definitions, (iv) the

---

[4]     *See also, e.g.*, *Adams v. Inter-Con Sec. Sys., Inc.*, No. 06-cv-5428, 2007 WL 3225466, at *3 (N.D. Cal. Oct. 30, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."); *In re Indep. Energy Holdings PLC*, No. 00-cv-6689, 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003) ("the fact that the settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable").

use of coupons, rather than cash payments, for class compensation, and (v) overly complicated claim forms. *See id.*

No such "red flags" are present in this Settlement. The size of the Settlement Fund ($8.5 million) and total recovery to the Settlement Class (the entirety of the net Settlement Fund, after first deducting Administration Costs and any Attorneys' Fees and Service Award) are both clearly established. The Settlement Fund is all-cash, and not comprised of any coupon or voucher component, and the Claim Form was straightforward and easy to file. Under no circumstances will any portion of the Settlement Fund revert back to Caribou.

Nor was the Settlement the result of any collusion. As described above, the Parties engaged in extensive negotiations with the Hon. Morton Denlow (Ret.) of JAMS. *See Butler v. Am. Cable & Tel., LLC*, 2011 WL 2708399, at *8 (N.D. Ill. July 12, 2011) ("[A]rm's-length negotiations facilitated by a neutral mediator is one factor . . . that supports a finding that the settlement was fair.") (citing *McKinnie v. JP Morgan Chase Bank*, 678 F.Supp.2d 806, 812 (E.D. Wis. 2009)). The timing of the mediation alone -- just after the Court denied Caribou's Motion to Stay pending resolution of *ACA Int'l* -- is clear evidence that there was no collusion in the negotiations that ultimately led to the Settlement.

Given the absence of any red flags, the absence of any collusion, and the presence of only minimal opposition to the Settlement (as discussed further below), the Court should grant final approval to the Settlement.

### F. The Relatively Minor Amount of Opposition to the Settlement Weighs in Favor of Final Approval

Finally, the Court should consider the fact that there is very little opposition to the Settlement to be "strong circumstantial evidence favoring settlement." *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020–21 (N.D. Ill. 2000) (finding that a settlement where

"99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlements"); *In re AT&T II*, 789 F. Supp. 2d at 965 (an exclusion or objection rate of 0.01% of class members was "remarkably low" and supported the settlement).

During the Claims Period, 73,703 Settlement Class members -- representing an impressive 13.9% of the Settlement Class -- filed Valid Claims against the Settlement and will receive a pro rata share of the Settlement Fund. Of the 527,816 Settlement Class members, only 26 excluded themselves from the Settlement, which shows that the sentiment among the Settlement Class concerning the Settlement is overwhelmingly positive.

Moreover, only four objections were filed: three by *pro se* objectors, Phil Hansen (ECF No. 59 (the "Hansen Objection")), Cale Johnson (ECF No. 60 (the "Johnson Objection")), Angela Guidarelli (ECF No. 68 (the "Guidarelli Objection")), and one by an objector represented by counsel, Susan Stradtmann (ECF No. 66 (the "Stradtmann Objection")). As set forth below, each of these objections should be overruled because none of them "cast doubt upon the settlement's fairness, reasonableness, on adequacy." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *11 (overruling objections that failed to do so); *see also Freeman v. Berge*, 68 F. App'x 738, 743 (7th Cir. 2003) (affirming final approval of settlement and recognizing that objections must have merit to be considered); Federal Judicial Center, Manual for Complex Litigation (Fourth) § 21.643 (2004) ("Even a weak objection may have more influence than its merits justify in light of the inherent difficulties that surround review and approval of a class settlement").

1. **The Hansen Objection, Cale Objection and Guidarelli Objection Seek to Deprive the Settlement Class of Any Relief and Futher Highlight the Risks of Non-Recovery Posed by Continued Litigation**

The Hansen Objection, the Johnson Objection and the Guidarelli Objection do not object to the fairness or adequacy of the relief provided to the Settlement Class under the Settlement.

To the contrary, each of these objections complains that the underlying claims asserted by Plaintiff were meritless, thereby *conceding* that the $8.5 million Settlement is an excellent outcome for the Settlement Class.

The Hansen Objection, the Johnson Objection and the Guidarelli Objection argue that this litigation has "zero merit" (Johnson Objection, at 1), concerns a "frivolous issue" (Hansen Objection, at 1), and is "unnecessary and unreasonable" (Guidarelli Objection, at 1). Plaintiff and Class Counsel respectfully disagree with these characterizations for the reasons below.

First, the Johnson Objection states that "[i]f [Plaintiff] didn't want to pay for the text message charges she should not have signed up for the service from Caribou Coffee." (Johnson Objection, at 1.) The problem with Mr. Johnson's argument is the indisputable fact that Plaintiff has never "sign[ed] up for the [text message] service from Caribou Coffee." (*See generally* First Amended Complaint (describing circumstances under which Plaintiff received and was unable to stop receiving approximately 50 SMS text message advertisements over the course of two months, and even after she filed suit, despite the fact that she has never provided her phone number or any other information to Caribou.) Nor has Caribou produced any records in this litigation evidencing the "express written consent" of any other member of the Settlement Class to receive text messages. Thus, Mr. Johnson's description of this case as "a pitiful attempt by the plaintiff" to seek "damages not incurred, earned, or deserved" is not well taken.

Plaintiff also disagrees with Mr. Hansen's statement that "[f]rivolous class action lawsuits such as this contribute to rising costs as companies recoup losses somehow by raising prices." (Hansen Objection at 1.) First, this lawsuit is not frivolous because Caribou, prior to delivering the text messages at issue, lacked Plaintiff's express written consent or the express written consent of the Settlement Class, as a matter of law. Second, Mr. Hansen's concern for

rising costs to companies as a result of TCPA litigation fails to account for the profits companies like Caribou generate by indiscriminately bombarding advertisements to consumers via text message -- the root cause of litigation under the TCPA. *See*, e.g., *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 562 (W.D. Wash. 2012) (recounting marketing company's promise to TCPA defendant to "increase the profits of Papa John's restaurants by sending text message advertisements to their customers," and granting class certification); *cf.* Sarah Perez, *When Growth Hacking Goes Bad*, Techcrunch, http://techcrunch.com/2014/01/03/when-growth-hacking-goes-bad/ (discussing text message "growth hacking") (last visited Nov. 20, 2017).

Moreover, the Johnson Objection and the Guidarelli Objection further illustrate the seriousness of the threat that Caribou's affirmative defense of express written consent would have posed to class certification had this litigation continued. Mr. Johnson and Ms. Guidarelli each claim to have enrolled in Caribou's loyalty program with the expectation that Caribou would send text messages to their cellular telephone. (Johnson Objection at 1 ("Caribou Coffee Company only texted me after I signed up requesting the service from them."); Guidarelli Objection at 1 ("As a Caribou Coffee customer, I consented to receive text messages regarding promotions from or no behalf of Caribou Coffee Company, Inc. I understood I was consenting to receive said text messages when I signed up for their rewards program. ").) Although Plaintiff firmly believes that Caribou lacked *anyone's* express written consent to deliver the advertising text messages at issue, the Johnson Objection and the Guidarelli Objection nonetheless illustrate that Caribou's affirmative defense of express written consent did present a real risk of total non-recovery to the Settlement Class, both at the time this litigation was commenced and at the time the Settlement Agreement was executed. As discussed above, if this case had not settled and Plaintiff had filed a contested motion for class certification, the Court could have found that

individual issues of consent predominate and denied class certification on that basis, resulting in complete non-recovery to the Settlement Class and non-reimbursement of fees or expenses to Class Counsel in this litigation. The risk of such an outcome underscores the outstanding result achieved by Plaintiff and Class Counsel with the Settlement.

The Hansen Objection, Johnson Objection and Guidarelli Objection do not seek to improve the Settlement and are not in the interests of the Settlement Class. Each of the three objections should be overruled.

### 2. The Stradtmann Objection is Baseless and Designed for the Improper and Dilatory Purpose of Holding Up Relief to the Settlement Class

The Stradtmann Objection was prepared by notorious serial objector attorney Christopher Bandas, whose pattern of abusive objections is well-documented. *See, e.g.*, *Chambers v. Whirlpool Corp.*, No. CV111733FMOJCGX, 2016 WL 5922456, at *7 (C.D. Cal. Oct. 11, 2016), *appeal docketed*, No. 16-56686 (9th Cir.); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012); *In re Gen. Elec. Co. Sec. Litig.*, 998 F.Supp.2d 145, 156 (S.D.N.Y. 2014); *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09md2087 BTM (KSC), 2013 WL 5275618, *5 (S.D. Cal. Sept. 17, 2013). As discussed in Plaintiff's motion to prohibit unauthorized communications and to disqualify Bandas Law Firm, P.C. (ECF No. 69), the Stradtmann Objection is not a bona fide objection but rather the product of an elaborate campaign to solicit and then confuse Settlement Class members into retaining Bandas to file objections, for the sole purpose of holding up relief to the Settlement Class until Bandas extracts payment from Class Counsel to go away.

The Stradtmann Objection also fails on the merits. The Stradtmann Objection simply recycles the same objections Bandas has repeatedly raised and consistently lost in past TCPA

settlements regarding the per-claimant payment structure and the amount of attorneys' fees requested by class counsel. Plaintiff responds to both categories of objections below in turn.

### a. Ms. Stradtmann's Objection to the Settlement is Baseless

. The Stradtmann Objection argues that "[w]ithout any idea of the number of texts sent by Caribou, there can be no fair estimation of what the class is giving up." (Stradtmann Objection at 6.) The argument is without merit. Class Counsel learned during discovery that Caribou, based on its contracts with its marketing company, sent approximately tens of millions of text messages during the Class Period, to approximately 527,816 different people. Even just two million texts, or approximately four to each Settlement Class member, would have brought the potential damages to either $1 billion (if negligent violations) or $3 billion (if willful and thus trebeled violations), assuming every text violated the TCPA. However, forty-million texts, the amount Class Counsel estimated based on the discovery produced by Caribou, would be at least $20 billion in damages. But the distinction is clearly without a difference. The analysis is the same whether it's two million texts or 40 million texts or anywhere in between, because a judgment for any of those amounts would bankrupt Caribou, leaving the Settlement Class entitled to no recovery.[5] *See In re Capital One,* 80 F. Supp. 3d at 790 (pointing out that in TCPA cases involving millions of class members and phone calls, potential TCPA liability often reaches into the billions if not trillions of dollars, and explaining that in such a case, "courts need not—and indeed should not—reject a settlement solely because it does not provide a complete victory to the plaintiffs[], especially . . . when complete victory would most surely bankrupt the prospective judgment debtor"). The Stradtmann Objection's suggestion that the Settlement

---

[5]  Class Counsel thoroughly examined Caribou's financial condition and insurance coverage in this case, including letters of declination from each of its insurance carriers with respect to liability coverage for this litigation.

should have recovered a sum in the ballpark of $13,250,000,000.00 is preposterous. (*See* Stradtmann Objection at 10.)

The Stradtmann Objection also complains that the $8.5 million provided by the Settlement is not enough money. Specifically, Ms. Stradtmann says the Settlement is insufficient because the class in *Aranda v. Carribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 818854 (N.D. Ill. Mar. 2, 2017) recovered between $56 and $76 million in a case involving approximately 1.2 million class members, slightly over twice as many Settlement Class members in this case, and because the class in *Gutierrez v. Barclays Grp.*, No. 10-CV-1012 DMS BGS, 2012 WL 12541830 (S.D. Cal. Mar. 12, 2012), recovered $8.2 million in a case where the defendant sent approximately 66,000 text messages. However, Ms. Stradtmann fails to mention that the settlement in *Aranda* was reached <u>the week before trial</u>, after the parties had "engaged in contested litigation for roughly four years," and only after the Court had already "denied defendants' motion to dismiss, granted plaintiffs' motion for class certification over defendants' objection, denied defendants' motions for summary judgment, granted in part plaintiffs' motion for summary judgment, and denied defendants' additional motion for summary judgment and class decertification." *Aranda,* 2017 WL 818854, at *1. At the time Class Counsel negotiated the Settlement in this case, the posture of the litigation was decidedly different -- the Settlement Class had neither been certified nor survived summary judgment -- and, as a result, further litigation presented numerous hurdles that did not exist at the time settlement was reached in *Aranda.* Likewise, Ms. Stradtmann's objection neglects to mention that in *Gutierrez*, a 2012 case, the class was confronted with none of the daunting litigation risks presented in this case, including the D.C. Circuit's consideration of the definition of ATDS in *ACA Int'l*, potential individual issues of consent that could result in the Court denying a contested motion for class

certification, or Article III standing issues presented by *Spokeo*. Moreover, Plaintiff would have faced an uphill battle on a contested motion for class certification given Caribou's prior express written consent defense to the class claims, which did not exist in *Aranda* or *Gutierrez*. For these reasons, *Aranda* and *Gutierrez* are legally and factually inapposite.

Ms. Stradtmann's objections to the projected claims rate at preliminary approval (Stradtmann Objection at 11-12) have been rendered moot by the resulting 13.9% claims rate, an outstanding result attributable to the robust Notice Program in this case.

The Stradtmann Objection complains that the Settlement awards each claiming Settlement Class member with the same Cash Award as opposed to allocating the Cash Awards based upon the number of text messages each claiming Settlement Class member received. (Stradtmann Objection at 13.) This argument fails for several reasons. First, it would not be administratively feasible to allocate the Settlement Fund to claiming Settlement Class members based on the number of messages each member received. This is especially true given the reassigned number issues that invariably exist in TCPA settlements, including the Settlement here; for example, claiming Settlement Class members like Ms. Farnham, who received texts to a number reassigned to her from a prior subscriber who had enrolled in Caribou's loyalty program, would only have received a fraction of the total number of texts sent to the cell phone number at issue, while the remainder would have been received by the prior subscriber of the number, who is also a Settlement Class member. The process of assigning a Cash Award based upon who subscribed to a number when, and the number of texts the member received when they were the subscriber, would have been an administrative nightmare involving issuing subpoenas to all of the cellular telephone providers across the country. Even without that reassigned number wrinkle, the process of figuring out how many advertising (but not informational) texts a

particular claiming Settlement Class member received, during the Class Period, and without consent, would have been an extremely expensive and burdensome process and would have depleted the Settlement Fund, reducing or even extinguishing relief to the Settlement Class. In any event, the nature of Caribou's text message campaigns at issue in this case demonstrate that the same type, number and frequency of text messages were sent to all cellular telephone numbers on Caribou's recipient list, indicating that members of the Settlement Class would have each received roughly the same number of text messages. For these reasons, it is not surprising that Bandas has repeatedly raised, and courts have consistently rejected, this same exact argument in connection with his objections to other TCPA class settlements in district courts of the Seventh Circuit.[6]

---

[6]    *See, e.g., In re Capital One,,* 80 F. Supp. at 789–90 (rejecting Bandas's argument, stating: "The settlement also falls far short of the $500 statutory recovery available for each phone call, of which there were many: Capital One or its Participating Vendors made approximately 1.9 billion phone calls in alleged violation of the TCPA. So if Plaintiffs were to litigate their claims successfully through trial, Capital One would be on the hook for a minimum of $950 billion. Moreover, Plaintiffs' recovery could possibly be as high as $2.85 trillion if Plaintiffs proved the violations were knowing or willful. But a settlement is a compromise, and courts need not—and indeed should not—reject a settlement solely because it does not provide a complete victory to plaintiffs. This is especially true when complete victory would most surely bankrupt the prospective judgment debtor. It also bears mention that the $34.60 per claimant recovery in this case does not seem so miniscule in light of the fact that class members did not suffer any actual damages beyond a few unpleasant phone calls, which they received ostensibly because they did not pay their credit card bills on time.") (quotation omitted); *Wilkins,* 2015 WL 890566, at *8 (rejecting Bandas's argument "urg[ing] the court to reject the settlement because it does not compensate class members based on the number of calls each class member received," explaining that "a per call claim process might wipe out the costs saved by foregoing discovery of each class member's call history. The court therefore agrees with Class Counsel and HSBC that a call-based claims process is inadvisable, particularly because the increased administration costs would result in a corresponding decrease in the money available to the class."); *Gehrich v. Chase Bank United States*, 316 F.R.D. 215 (N.D. Ill. 2016) (rejecting Bandas's argument "that the number of calls that each class member received does not affect that member's recovery; in other words, the characteristics that determine each class member's actual payout do not include call volume or number of phone numbers affected," and explaining: "It is true that the TCPA provides for statutory damages per violation, so one individual may have many claims. Yet conducting individual inquiries into the number of violations for each class member either would

Tellingly, in the Stradtmann Objection, Bandas fails to cite to any of these prior decisions rejecting this same argument raised by Bandas here.

### b. Ms. Stradtmann's Objection to the Requested Attorneys' Fees and Service Award is Completely Without Merit

The Stradtmann Objection argues that "the *ex ante* market is not 30%-40%" for an award of attorneys' fees in this case. (Stradtmann Objection at 16.) According to Ms. Stradtmann, "[w]hile there are outliers, the 'data available on past awards in TCPA cases and other class actions show[s] that the median fee for large TCPA class actions were between 20% and 24% of the settlement fund[.]'" (*Id.* (quoting *Wilkins*, 2015 WL 890566, at *10).)

That is remarkably disingenuous given that *Wilkins*, the decision Bandas quotes in the excerpt of the Stradtmann Objection above, involved a $40 million TCPA settlement and was thus subjected to the sliding scale approach articulated in *In re Capital One*, in which the percentage of the fund awarded as fees decreases, incrementally, as the size of the settlement decreases. Bandas, of course, knows this full well, having objected (unsuccessfully) to both the *Wilkins* and *In re Capital One* settlements. In fact, *Wilkins* and *In re Capital One* both support Class Counsel's request for one-third of the net Settlement Fund, because the requested percentage is actually <u>less than</u> the 36% market rate for such high-risk TCPA settlements of less than $10 million (as explained in *In re Capital One*) and is inclusive of costs.

The Stradtmann Objection asserts that "[i]n recent TCPA cases, courts have commonly awarded a percentage of 20% or less to class counsel," and then in support cites to a handful of decisions from district courts of the Ninth Circuit -- where the base fee benchmark is 25%, not

---

be administratively unmanageable or, if it were not, would deplete the settlement fund through vastly increased administrative expenses, reducing the amount available to claimants and increasing the delay in receiving their awards. In addition, because the two pro rata distributions will exhaust the settlement fund, this aspect of the settlement is far less of a concern than it would have been had any leftover funds reverted to Chase.").

30% like it is in the Seventh Circuit -- as well as to *Wilkins*, *Aranda*, *In re Capital One*, *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215 (N.D. Ill. 2016) (awarding 25% for $34 million), and *Arthur v. Sallie Mae, Inc.*, 2012 WL 4076119, at *2 (W.D. Wash. Sept. 17, 2012) (awarding fees of 20% of $24 million fund), all of which, again, involved settlement funds well in excess of $10 million and thus resulted in an allocation of fees using percentages assigned to bands over $10 million in recovery. (Stradtmann Objection at 16-17.) Each of those cases is therefore completely inapposite, except to the extent they demonstrate that 30% plus a 6% risk premium is an appropriate award where, as here, the Settlement Fund does not exceed $10 million.

Indeed, as discussed in the motion for attorneys' fees, Plaintiff signed entered an engagement agreement with Class Counsel providing for a fee of between 35-40% of the total recovery. While not dispositive, "[w]hen a court determines the size of an attorney's fee award, it is appropriate for it to consider any agreement between class counsel and class representatives about fees and expenses." 5 J. Moore, et al., *Moore's Fed. Practice -- Civil* § 23.124 (2010). In overruling objections and awarding a 30% common fund fee in another class action settlement, Judge Crabb noted that in that case:

> The question is not how risky the case looks when it is at an end but how the market would have assessed the risks at the outset. What fee arrangements other lawyers have required before they would have taken the case? On this point, the only evidence is what plaintiffs have submitted, which is that class action fee arrangements with well qualified counsel, <u>such as plaintiffs' counsel in this case</u>, are rarely set lower than one-third of the recovery.

*Goodell v. Charter Communications, LLC*, No. 08-cv-512-bbc, 2010 WL 3259349, at *1 (W.D. Wis. Aug. 17, 2010) (emphasis added). Thus, the agreement entered into between Plaintiff and Class Counsel *ex ante* is representative of the sort of agreement that members of the Settlement Class would likewise have entered into *ex ante*.

Moreover, in determining whether to meet Class Counsel's fee, the Settlement Class would have known that no other firm had come forward to offer its services in this matter to the class or individual participants. Indeed, even after this case was filed and discussed several times in the legal news journals, no other counsel came forward to compete with Class Counsel for control of the case, to propose to the Court that it be appointed lead counsel at a lower fee structure, or to offer to share in the case's risk and expense with Class Counsel. *Id.* The market thus judged this to be a high-risk case. Competition for control is brisk when lawyers think cases have significant potential to generate large recoveries and significant attorney's fees. *See Synthroid II*, 325 F.3d at 979. Thus, as Judge Easterbrook once observed: "Lack of competition not only implies a higher fee but also suggests that most members of the . . . bar saw this litigation as too risky for their practices." *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). That is exactly the circumstance here. Other attorneys and firms chose to pass on offering representation to Settlement Class members in this case because they found it not worth the risk, firmly establishing that Class Counsel would have been able to obtain a the requested fee of one-third the net Settlement Fund in an *ex ante* negotiation with the Settlement Class.

The Stradtmann Objection argues that the requested fee award -- roughly five times the total lodestar incurred prosecuting this case -- is unreasonable. But the Stradtmann Objection fails to articulate *why* the requested fee is unreasonable, and instead simply cites to a handful of inapposite decisions in different types of cases in different jurisdictions. The Stradtmann Objection fails to explain why a lodestar crosscheck is helpful in replicating the *ex ante* market for Class Counsel's services to the Settlement Class in this litigation, which is the relevant

inquiry for determining an appropriate fee to Class Counsel in this case (as discussed in Plaintiff's motion for attorneys' fees).

As the Court undoubtedly knows, there are strong arguments in favor of using the percent-of-the-fund method to replicate the *ex ante* market value of Class Counsel's services. It is not just the typical method used in contingency-fee cases, *see Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998), and in all likelihood the means by which an informed Settlement Class and Class Counsel here would have established counsel's fee, but it also better aligns Class Counsel's interests with those of the Settlement Class because it bases the fee on the results the lawyers achieve for their clients rather than on the number of motions they file, documents they review, or hours they work, and it avoids some of the problems the lodestar-times-multiplier method can foster (such as encouraging counsel to delay resolution of the case when an early resolution may be in their clients' best interests). *Florin*, 34 F.3d at 566; *Synthroid*, 264 F.3d at 720-21. It is also simpler to apply. *Id*. But the Seventh Circuit recently reiterated its previously-stated view that the lodestar-times-multiplier approach is not so flawed that it should be entirely off-limits to district courts in their simulation of an *ex ante* arm's-length negotiation between an informed class and class counsel. *Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014). Nonetheless, a fee of one-third the net Settlement Fund, equating to a lodestar multiplier of five, represents the *ex ante* market for a case as risky as the instant matter.

A multiplier of five compares favorably with cases like *Williams*, cited in Plaintiff's motion for attorneys' fees, where the multiplier was 5.85, *see Williams v. Rohm and Haas Pension Plan*, No. 04-0078-SEB, 2010 WL 4723725 (S.D. Ind. Nov. 12, 2010), *aff'd*, 658 F.3d 629 (7th Cir. 2011), Dkt. No. 317-2 (showing lodestar of $7.43 million; because fee award was

$43.5 million, multiplier was 5.85). Significantly, Class Counsel is aware of at least two prior decisions in the TCPA class action context where courts awarded fees equating to a lodestar with a multiplier much larger the multiplier of five requested here -- <u>and did so after overruling Bandas's objections to the fee requests on the ground that, just like in this case, the lodestar multiplier was too high</u>. First, in *In re Capital One*, 80 F. Supp. 3d at 809, the court awarded class counsel, who had a total lodestar of $2,213,76, *id.*, Dkt. 252 at 3-6, a total fee of $15,668,265, *id.*, representing a lodestar multiplier of 7.07. Second, in *Wilkins*, Case No. 14-cv-190, 2015 WL 890566, the court awarded class counsel, who had a total lodestar of $860,082, *id.*, Dkt. 90 at 2, a total fee of $9,495,000, *id.*, at *11, representing a lodestar multiplier of 11.03. There is nothing unreasonable about Class Counsel's request for one-third of the net Settlement Fund, which is clearly within the range of market rates for this case, just because the requested fee equates to five times Class Counsel's reasonable lodestar in this case.

Ultimately, the Stradtmann Objection concludes that Class Counsel's fee award in this case "should fall somewhere between 20%-25%" of the net Settlement Fund, <u>despite the fact that Ms. Stradtmann, at deposition, stated that Class Counsel deserves a fee of only 10% of the Settlement Fund</u>. That Ms. Stradtmann has such little familiarity with her own Objection -- at deposition, for example, she admitted to have never even reviewed the Objection before it was filed -- confirms that the Stradtmann Objection is not a bona fide objection but rather a Bandas-driven shakedown attempt. It should be overruled in its entirety.

Finally, the requested Service Award of $10,000 to Ms. Farnham should be approved. Contrary to Ms. Stradtmann's Objection, Ms. Farnham was deeply involved in this litigation with Class Counsel, and the amount requested here, $10,000, is comparable to or less than other awards approved by federal courts in Illinois and elsewhere. *See, e.g., In re Southwest Airlines*

*Voucher Litig.*, No. 11-8176, 2013 WL 4510197, *11 (N.D. Ill., Aug. 26, 2013) (awarding $15,000 each to two named plaintiffs); *Heekin v. Anthem, Inc.*, No. 05-01908, 2012 WL 5878032, *1 (S.D. Ind. Nov. 20, 2012) (approving $25,000 incentive award to lead class plaintiff over objection); *Will v. Gen. Dynamics Corp.*, No. 06-698, 2010 WL 4818174, *4 (S.D. Ill. Nov. 22, 2010) (awarding $25,000 each to three named plaintiffs); *Benzion v. Vivint, Inc.*, No. 12-61826, DE 201 (S.D. Fla. Feb. 23, 2015) (awarding $20,000 incentive award in TCPA class settlement); *Desai v. ADT Security Servs., Inc.*, No. 11-1925, DE 243 ¶ 20 (N.D. Ill. Feb. 27, 2013) (awarding $30,000 incentive awards in TCPA class settlement). The requested Service Award of $10,000 to Ms. Farnham is reasonable and should be approved.

## V.    CONCLUSION

For the foregoing reasons, the Settlement should be granted final approval.

Dated:  November 20, 2017                    Respectfully submitted,

By: /s/  Frank S. Hedin

**CAREY RODRIGUEZ**
**MILIAN GONYA, LLP**

David P. Milian
Florida Bar No. 844421
dmilian@careyrodriguez.com
Frank S. Hedin
Florida Bar No. 109698
fhedin@careyrodriguez.com
1395 Brickell Avenue, Suite 700
Miami, Florida 33131
Telephone: (305) 372-7474
Facsimile:  (305) 372-7475

*Counsel for Plaintiff*