KRISTIE FARNHAM, individually
and on behalf of all others similarly situated,

                        Plaintiff,                                    OPINION

        v.                                                            16-cv-295-wmc

CARIBOU COFFEE COMPANY,

                        Defendant.

On November 27, 2017, the court held a fairness hearing on the proposed final settlement agreement between Caribou Coffee and the putative class. In addition to the requests for final approval and attorneys' fees (dkt. ##88, 61), the court had four timely objections from class members (dkt. ##59, 60, 66, 68) as well as a motion by class counsel to (1) prohibit unauthorized communications with class members and (2) to disqualify the Bandas Law Firm from its representation of objector Susan Stradtmann (dkt. #69).[1] The court also had requests from Stradtmann (1) to strike plaintiff's reply brief or to file a sur-reply on the motion to prohibit and disqualify (dkt. #92) and (2) for permission to file an opposition to plaintiff's motion for final approval (dkt. #94). Consistent with the court's order resolving these motions (dkt. #98), the court issues this opinion.

## BACKGROUND

On May 5, 2016, Kristie Farnham brought suit on behalf of herself and all others similarly situated alleging that Caribou Coffee had violated the Telephone Consumer

---

[1] The court also received an untimely objection which is addressed below.

Protection Act (the "TCPA") by sending advertisements via SMS text messages en masse to the cell phones of class members through use of an automatic telephone dialing system ("ATDS"), without express written consent. *See* 47 U.S.C. § 227(b). Plaintiff sought injunctive and monetary relief.

On June 13, 2017, plaintiff filed an unopposed motion for preliminary approval of class action settlement, which was granted on July 28, 2017. (*See* dkt. ##50, 54.) As the court previously explained

> [T]he settlement provides for a $8,500,000.00 settlement fund for a class consisting of individuals in the United States who received at least one text message from defendant between May 5, 2012, and [July 28, 2017]. After deducting reasonable administrative costs and attorneys' fee and service awards . . ., each class member who submits a claim by the deadline will receive a pro rata share of the remainder. . . . [Any] remaining funds will be distributed to approved claimants if the distribution would amount to at least $1.00 after administrative costs, and if not, they will be distributed to a charitable organization concerned with consumer protection issues consistent with the interests of the class, as agreed upon by counsel for the parties and approved by the court. Counsel will petition for fees in the amount of thirty-five percent of the settlement fund after notice and reasonable administrative costs, estimated at approximately $351,756.88, are deducted, as well as a $10,000 enhancement payment for named plaintiff Farnham. Accepting these reductions and using a predicted claim rate of five percent for a class of nearly 530,000 individuals, counsel estimates that each claimant would receive approximately $200.00.

(Prelim. Approval Order (dkt. #54) 2-3.)[2] The settlement also provides non-monetary

---

[2] The court specifically excluded certain individuals from the class, including Caribou Coffee employees and their relatives. (*See* dkt. #54 at 4-5.) The class has 527,816 members. (*See* Mot. Final Approval (dkt. #88) 2.) Further, the parties have not yet designated the charitable organization to receive any remaining funds, but rather, should such money remain, the parties will seek a court order to distribute that money. (*Id.* at 7 n.2.)

relief to class members: Caribou Coffee agreed to cease all text message advertising and to instead use a downloadable mobile application, and if Caribou Coffee resumes a text message advertising campaign, it will implement best practices that comply with the TCPA and related FCC regulations, as well as train key employees and update its technology to prevent TCPA violations. (Mot. Final Approval (dkt. #88) 1-2, 7-8.) The court noted that the proposed settlement appeared "facially reasonable" and specified that it would "scrutinize plaintiff counsel's application for attorneys' fees" at final approval. (Dkt. #54 at 4.) In a subsequent order, the court clarified that the fairness hearing would be held on November 27, 2017 at 10 a.m. (Dkt. #55.)

## OPINION

### I.  Motion for Final Approval

Plaintiff requested final approval for the class action settlement (Mot. Final Approval (dkt. #88)), which was granted at the fairness hearing (dkt. #98).[3] Under Federal Rule 23(e), a court may approve a class action settlement that would bind the unnamed members of the class following "reasonable" notice; a fairness hearing; and a determination that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P.

---

[3] At the eleventh hour, Stradtmann sought leave to file an opposition to the motion for final approval. (*See generally*, Mot. Leave (dkt. #94).) Complaining that "[t]here [was] no reason why" the motion for final approval was filed "the same week [as] the Thanksgiving holidays and three working days ahead of the fairness hearing," she argued that she "critical[ly]" had to "correct an assortment of inaccuracies" and "misleading portrayal of authority in the Seventh Circuit." (*Id.* at 2.) The court denied the motion because: (1) the court had already considered Stradtmann's formal objection and she proposed no new ground to cover; (2) Stradtmann could have sought to supplement her objection earlier; and (3) the court had already considered applicable Seventh Circuit law.

23(e)(1)-(3). A district court must "'exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions,'" similar "'to the high duty of care that the law requires of fiduciaries.'" *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652-53 (7th Cir. 2006) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002)). There is a risk that a proposed settlement enriches class counsel, without providing meaningful recovery for the class. *See Wilkins v. HSBC Bank Nevada, N.A.*, No. 14 C 190, 2015 WL 890566, at *4 (N.D. Ill. Feb. 27, 2015) (quoting *Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir. 2010)).

To evaluate the fairness of a settlement, the court must consider

> the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement.

*Synfuel*, 463 F.3d at 653 (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)). Of these factors, the most important is the strength of plaintiffs' case compared to the settlement offer. *Id.* To evaluate it, the court should quantify the expected net value of continued litigation by estimating a range of possible outcomes. *Id.* All of these factors should be viewed "in the light most favorable to the settlement." *Isby*, 75 F.3d at 1199 (internal quotation and citation omitted). All factors weigh in favor of the settlement here.

## A. Notice

Plaintiff's counsel represented that through the court-approved notice procedures, the Settlement Administrator contacted "hundreds of thousands of members of the

Settlement Class by *both* postal mail . . . *and* email, as well as [by] executing an extensive online publication notice campaign." (Mot. Final Approval (dkt. #88) 2.) All class members who could reasonably be identified received direct notice through email and regular mail, such that the Settlement Administrator sent 503,900 postcard and 477,850 email notices. (*Id.* at 10.) According to counsel, 99% of the people associated with the telephone numbers in Caribou Coffee's records received individual notice. (*Id.*) Additionally, notice was electronically published in banner advertisements on the *Yahoo Ad Network*, "delivering over 10 million impressions on both a national and geo-targeted basis." (*Id.*) Sponsored search listings were purchased on Google, Yahoo and Bing, leading to 1,846 clicks to the Settlement Website.[4] (*Id.*) Notice was also sent to state, territorial, and federal attorney generals. (*Id.*)

A total of 73,703 members (13.9%) filed claims, surpassing the predicted 5% claims rate. (*Id.*) Because of this higher-than-anticipated claims rate, the administration and settlement costs are greater than the projected $351,756.88. (*Id.* at 8.) Epiq, the Settlement Administrator, advised that the costs have increased to $657,157.32. (Supp. West Decl. (dkt. #97) ¶ 6.)[5] At the fairness hearing, class counsel represented that each claimant class member will receive $70.80.

---

[4] The website alone received 82,217 visits; at least 1,017 calls were received by the toll-free number. (Mot. Final Approval (dkt. #88) 11.)

[5] Following the fairness hearing, the parties were directed to "determine a final, total cost of administration and to advise the court accordingly." (Order (dkt. #98) 2.) The parties have confirmed that this is the final amount. (Joint Notice (dkt. #101) 1; *see also* West Supp. Decl. (dkt. #102) 1.)

The court previously concluded that the notice program "satisf[ied] each of the requirements of Fed. R. Civ. P. 23(c)(2)(B) and adequately put the Rule 23 class members on notice of the proposed settlement." (Prelim. Approval Order (dkt. #54) 7.)

## B. Strength of Plaintiffs' Case Compared to Defendant's Settlement Offer

As noted, this is the most important factor in considering whether a class settlement is fair. *Synfuel*, 463 F.3d at 653. To evaluate it, the court should quantify the expected net value of continued litigation by estimating a range of possible outcomes. *Id.*

### 1. Plaintiff's Perspective

Plaintiff argued that the $8.5 million offered by Caribou Coffee "is substantial," and recognized that there are "legal uncertainties associated with continued litigation that pose substantial risk of non-recovery to the Settlement Class." (Mot. Final Approval (dkt. #88) 13.) Plaintiff identified the following legal uncertainties: (1) the anticipated D.C. Circuit decision in *ACA Int'l* which could revise the definition of "automatic telephone dialing system," possibly erasing plaintiffs' cause of action under the TCPA (*id.* at 14); (2) Caribou's "reasonable chance of defeating class certification on the ground that individual issues . . . predominate on the key issue of consent" (*id.* at 14-15); and (3) Caribou's asserted affirmative defense of "excessive fines and due process" (*id.* at 15). Plaintiff also recognized that if litigation continued and class certification were granted, victory at trial was not guaranteed, and that even if victory at trial was achieved, it could be subject to appeal. (*Id.*) Further, plaintiff recognized that the damages resulting from a victory in a large TCPA class action could be rendered a nullity by defendant's bankruptcy.

(*Id.* at 15-16.)  Plaintiff thus argued that the settlement provides substantial and fixed results.  (*Id.* at 16.)

Plaintiff also contended that "[n]one of the objections are bona fide attempts to improve the Settlement for the benefit of the Settlement Class, and they should each be overruled."  (*Id.* at 3.)

### 2.  Defendant's Perspective

Caribou Coffee submitted a brief in support of plaintiff's motion for final approval. (*See generally* Def.'s Mem. Supp. (dkt. #89).)  Defendant argued that plaintiff's claims are weak for three reasons: (1) defendant did not violate the TCPA because it had obtained prior express consent before sending text messages via autodialer (*id.* at 2-3); (2) it is unlikely that plaintiff would be able to maintain a class action because her claims are unlikely to meet the typicality requirement under Rule 23 because she had received the text messages in error after a prior owner of her phone number had signed up for messages (*id.* at 3); and (3) the proposed class could not be certified because it is not ascertainable, because it would be "nearly impossible" to identify those who had been contacted because of reassigned numbers (*id.* at 4).  For these reasons, Caribou Coffee believed that the settlement "more than adequately compensate[d] class members, given the weakness of their claims, cash payments, and the information provided to class members of their legal rights."  (*Id.*)

### 3.  Non-Stradtmann Objections

Importantly three class members submitted written objections essentially asserting

that this lawsuit [was] frivolous.[6]  First, Phil Hansen objected to the settlement, counsel's fee petition and the "entire class action."  (Hansen Obj. (dkt. #59) 1.)  He expressed concern that the court "[was] wasting time on this frivolous issue" and alleged that only plaintiff's counsel "[would] receive anything meaningful."  (*Id.*)  He considered the settlement to be both "frivolous" and "unwarranted."  (*Id.*)  He implied that the alleged injury suffered by plaintiff was not in fact injurious.  (*Id.* ("I . . . practically laughed out loud as I read how the plaintiff experienced wasted time and how her cellular device experienced diminished battery life.  Oh my -- what a terrible fate.").)  He added that this type of "[f]rivolous class action . . . contribute[s] to rising costs as companies recoup losses somehow by raising prices."  (*Id.*)

Second and similarly, Cale Johnson argued that the "case ha[d] zero merit, and [was] merely a pitiful attempt by the plaintiff and counsel seeking damages not incurred, earned, or deserved."  (Johnson Obj. (dkt. #60) 1.)  Like Hansen, he challenged plaintiff's alleged injury, noting that few modern cell phone plans charge for text messages and that it was the responsibility of individual plaintiffs to understand their cell phone plans.  (*Id.*)  Johnson also challenged plaintiff's allegation that she did not consent to receiving advertising text messages by explaining that defendant only received his cell phone number when he provided it, at which time he agreed to the terms and conditions.  (*Id.*)

Angela Guidarelli objected to the settlement as "unnecessary and unreasonable"

---

[6] Notably, objectors can play a crucial role in achieving a fair settlement for the class: "If their objections persuade the judge to disapprove [the settlement], and as a consequence a settlement more favorable to the class is negotiated and approved, the objectors will receive a cash award that can be substantial."  *Eubanks v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014).

because the "alleged violation" was nonexistent: she opined that Caribou Coffee "was very clear with the communication regarding the text message marketing program," such that receipt of text messages "would be expected" upon signing up for rewards. (Guidarelli Obj. (dkt. #68) 1.) She added that she "understood [she] was consenting to receive said text messages when [she] signed up for [Caribou Coffee's] rewards program" and that the settlement's forced discontinuance of the text marketing program was "an inconvenience and a great disadvantage to those who opted in to the program and wish to receive the text messages." (*Id.*) These objectors did not appear at the fairness hearing.

Plaintiff characterized these objections as "*conceding* that the $8.5 million Settlement is an excellent outcome for the Settlement Class." (Mot. Final Approval (dkt. #88) 23.) Plaintiff disputed Johnson's argument that "[plaintiff] should not have signed up for the service from Caribou Coffee" (*id.* (citing Johnson Obj. (dkt. #60) 1)), asserting that plaintiff never signed up to receive the text messages (*id.*). Plaintiff (obviously) disagreed with Hansen's assertion that this lawsuit [was] frivolous, again relying on her claim that she had not provided express written consent to receive the text messages. (*Id.*) Plaintiff discounted Hansen's argument that this type of lawsuit leads to increased costs for consumers by saying that Hansen failed to account for profits generated by companies through aggressive text message advertising campaigns. (*Id.* at 23-24.) Plaintiff recognized that the Johnson and Guidarelli objections "illustrate that Caribou's affirmative defense of express written consent did present a real risk of total non-recovery to the Settlement Class," which plaintiff argued "underscore[d] the outstanding result achieved by Plaintiff and Class Counsel." (*Id.* at 24-25.)

While these objections raise a legitimate question as to the efficacy of the TCPA restrictions, particularly as cellular telephone use becomes increasingly cheap, this is not for the court to decide. This lawsuit is valid under the law and it is for Congress to decide whether to change that. Therefore, under the TCPA and current case law, the Hansen, Johnson and Guidarelli objections are rejected. Since filing a claim was effectively a precondition for submitting an objection, the court has required class counsel to inform these objectors of the court's ruling and of their options regarding payment for their claims, including that they need not cash their claims checks.

### 4. Stradtmann Objection

The final objector, Susan Stradtmann, took a very different tact: instead of challenging the legitimacy of the claims at issue, she argued that the class had insufficient information and that the settlement itself was insufficient -- in terms of dollars, by failing to differentially award damages based on number of text messages received, and by providing too much in attorneys' fees and incentive award. (*See generally* Stradtmann Obj. (dkt. #66).)

Class counsel characterized Stradtmann's objection as "unremarkable . . . boilerplate, baseless, and aimed solely at delaying final resolution of this litigation -- the workaday product of a serial objector." (Mot. Prohibit & Disqualify (dkt. #69) 1; *see also* Mot. Final Approval (dkt. #88) 25 (Stradtmann's objection characterized as "the product of an elaborate campaign to solicit and then confuse Settlement Class members into retaining Bandas to file objections, for the sole purpose of holding up relief to the Settlement Class until Bandas extracts payment from Class Counsel to go away.").)

10

Plaintiff argued that the objection has been "recycle[d]" from other Bandas TCPA objections. (Mot. Final Approval (dkt. #88) 25-26; *id.* at 29 n.6 (citing cases rejecting Bandas arguments for awarding damages to class members based on the number of phone calls received).)

First, Stradtmann objected that without an estimate of how many total text messages sent by Caribou Coffee it was impossible for the court and class members to appropriately consider how much of a discount the class was taking on possible monetary damages. (Stradtmann Obj. (dkt. #66) at 6-9.)[7] She pointed out that assuming that each of the 530,000 class members received only fifty text messages (the number allegedly received by Farnham, but far fewer than the hundreds allegedly received by Stradtmann), class damages would exceed $13 billion based on the statutory penalty of $500/violation. This, she argued, meant that the proposed $5.4 million in the settlement fund earmarked for class recovery would be only 0.04% of the potential damages. (*Id.* at 11.)

Plaintiff responded that during discovery counsel approximated that Caribou Coffee sent 40 million text messages, but that this was irrelevant because whether defendant sent that number or a much lower number, the statutory liability would have been bankrupting. (Mot. Final Approval (dkt. #88) at 26.) Plaintiff recognized that recovery approximating the statutory liability "is preposterous." (*Id.* at 26-27.) For its part, defendant argued that this objection of Stradtmann missed the mark because Caribou Coffee "had the required

---

[7] As part of her argument that there is insufficient information about the proposed settlement, she asked that the court unseal the expert report of Randall Snyder so that the court and class members may review it. (Stradtmann Obj. (dkt. #66) 8-9.) For the reasons discussed above, the court is unconvinced that Stradtmann or her counsel has shown good cause for doing so.

consent to text customers."  (Def.'s Mem. Supp. (dkt. #89) 5-9.)

Second, Stradtmann objected that the amount per claimant was insufficient because it paled in comparison to recent TCPA settlements and that a pro rata share was inappropriate because the class members did not suffer the same injury.  (Stradtmann Obj. (dkt. #66) at 12-14.)  Plaintiff persuasively argued that distinguishing between the different number of text messages received would not be practical, especially in light of the "reassigned number" problem, where a class member received text messages because their phone number had been reassigned, such that that class member and another would each have received some of the text messages sent improperly.  (Mot. Final Approval (dkt. #88) 28.)  That distinct problem aside, plaintiff also pointed out that tabulating the total number of advertising text messages received during the class period without consent would be "extremely expensive and burdensome," which "would have depleted the Settlement Fund," reducing or eliminating monetary damages.  (*Id.* at 28-29.)  In addition, the objection undermines the very basis for a class action, which would leave most proposed members of the class with *no* practical remedy.  Finally, the distinction in damages is at least partially addressed by the need to opt in to recover, where those feeling most put upon (whether by number of messages or sheer personal annoyance) will presumably opt in in greater numbers and recover more.

### 5.  Untimely Objection

Following the November 27 fairness hearing and the court's approval of the class action settlement (*see* Order (dkt. #98)), an untimely *pro se* objection to the settlement was filed by class member Kristian Mierzwicki (Mierzwicki Obj. (dkt. #104)).  If nevertheless

approved, Mierkzwicki asks alternatively to be excluded from the settlement, for reconsideration of the settlement decision, and sanctions against class counsel. As for his untimeliness, he reports being "made aware of the existence of this case by accident on December 5th," claiming that he never received notice because of "flaw[ed]" notice process. (*Id.* at 2, 4-5.) In any class settlement, some class members may not receive timely notice; "'the function of the filing deadline is to put a time limit on the claims procedure' to achieve finality and certainty in class action settlements." *In re VMS Sec. Litig.*, No. 89 C 9448, 1992 WL 203832 at *5 (N.D. Ill. Aug. 13, 1992) (quoting *Valente v. Pepsico, Inc.*, 89 F.R.D. 352, 363 (D. Del. 1981)). For this reason, "[a]dequacy of notice to the class as a whole determines the binding effect of a class settlement on an individual class member." *Id.* at 5 (quoting *Langford v. Devitt*, 127 F.R.D. 41, 44 (S.D.N.Y. 1989)). Due process does not require more, except perhaps under extreme circumstances not claimed by Mierkzwicki. *See id.* at *3 (quoting *In re VMS P'ship Sec. Litig.*, No 90 C 2412 (N.D. Ill. May 19, 1991)).

Here, the court previously concluded that the notice procedures "satisf[ied] each of the requirements of Fed. R. Civ. P. 23(c)(2)(B) and adequately put the Rule 23 class members on notice" (Prelim. Approval Order (dkt. #54) 7), and class counsel's represented that 99% of people associated with the telephone numbers in Caribou Coffee's records received individual notice" (Mot. Final Approval (dkt. #88) 10). Under Rule 60(b), "the court may relieve a party . . . from a final judgment, order, or proceeding for . . . (1) mistake, inadvertence, surprise, or excusable neglect; . . . or (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b)(1), (6); *see also VMS Sec. Litig.*, 1992 WL 203832 at *2 ("The standard for granting an enlargement of time after the expiration of the specified opt-out period is

'excusable neglect.'" (internal citations omitted)). Non-receipt of the notice of class settlement -- "[i]n the absence of any claim that non-receipt of notice . . . stemmed from failure to comply with the court ordered notice procedure" -- is not excusable neglect. *VMS Sec. Litig.*, 1992 WL 203832 at \*3; *see also Schulte v. Fifth Third Bank*, No. 09 C 6655, 2012 U.S. Dist. LEXIS 16885, at \*3-4 (N.D. Ill. Feb. 10, 2012) ("Candle Sense is bound by the settlement terms and release in the federal action, regardless of whether it actually received timely notice of the settlement and opt-out deadline."); *Russell v. United States*, No. C. 09-03239 WHA, 2010 U.S. Dist. LEXIS 49573, at \*10-\*11 (N.D. Cal. Apr. 23, 2010) ("[W]hile it is unquestionable that Mr. Davidson did *not* receive actual notice of the class action or the proposed settlement in *Briggs*, and was not 'at fault' for failing to receive such notice . . ., this does not -- without more -- warrant a finding of 'excusable neglect.'"). Accordingly, Mierzwicki will not be excluded, and his objections are untimely. In any event, Mierzwicki's belated objections are already adequately addressed in this decision and need not be addressed further.

### 6. The Strength of Plaintiffs' Case Weighs in Favor of the Settlement

The parties involved have reached a settlement that fairly compensates plaintiffs for their "injuries." As objector Guidarelli recognized, individual plaintiffs could have provided prior consent; this could have defeated class certification or drastically reduced potential damages. *See Bayat v. Bank of the W.*, No. C-13-2376 EMC, 2015 WL 1744342, at \*4 (N.D. Cal. April 15, 2015) (citing *Johnson v. First Credit Servs., Inc.*, 290 F.R.D. 92, 107 (N.D. Ill. 2013) and *Fields v. Mobile Messengers Am., Inc.*, No. C 12-5160 WHA, 2013 U.S. Dist. LEXIS 163950, at \*13 (N.D. Cal. Nov. 18, 2013), in which the courts declined

to certify TCPA classes because the question of consent was an individualized inquiry). On the other hand, if a class of plaintiffs could establish liability at trial, Caribou Coffee would have an argument to reduce the statutorily-provided damages. *See Wilkins*, 2015 WL 890566, at \*5 (recognizing the possibility that "a total plaintiffs' victory may not comport with due process considerations"); *see also In re Capital One Telephone Consumer Protection Act Litigation*, 80 F. Supp. 3d 781, 790 (N.D. Ill. 2015) (hereinafter *Capital One*) (recognizing that TCPA liability "would most surely bankrupt the prospective judgment debtor"). It seems that the parties considered these possibilities and came to a resolution with which they could live.

While Stradtmann's argument that the settlement comprises only 0.04% of the possible recovery under the TCPA is shocking at first glance, this is not a reason to reject the settlement. *See Capital One*, 80 F. Supp. 3d at 790 (explaining that courts should not "reject a settlement solely because it does not provide a complete victory to plaintiffs," especially "when complete victory would most surely bankrupt the prospective judgment debtor" and where the monetary relief per claimant "does not seem so miniscule in light of the fact that class members did not suffer any actual damages beyond a few unpleasant phone calls" for which they were not completely blameless). "[A] class-wide recovery in line with the statutory awards is unrealistic" and as in *Capital One* (and as argued by the other objectors), "the strength of Plaintiff[']s case d[oes] not warrant a settlement anywhere close to the statutory award." *Id.* at 793. Plaintiff even recognized that recovery near the statutory limit would be "preposterous." (Mot. Final Approval (dkt. #88) 26-27.)

Stradtmann's argument that the settlement "deviate[d] from typical TCPA

recovery" (Stradtmann Obj. (dkt. #66) 11), was based on her cherry picking individual TCPA cases with which to compare the total recovery (*id.* at 11-12).[8]  The Northern District of Illinois analyzed 72 TCPA class action settlements and determined that the vast majority of them settled for less than $7 million.  *Capital One*, 80 F. Supp. 3d at 799.

Plaintiff is correct that differential payments based on the number of text messages received would be too costly and burdensome, and would reduce plaintiffs' recovery.  *See Wilkins*, 2015 WL 890566, at *8 (determining that distributing funds on a per-call basis would be "inadvisable, particularly because the increased administration costs would result in a corresponding decrease in the money available to the class").  Also, at the end of the day, the burden of the errant text messages may not equate to their number, but rather to a personal tolerance, which again can be measured in part by an individual's decision to file a claim.

In short, the settlement provides an outcome that is at least comparable, if not far superior, to that which the class would face without settlement.  Therefore, the comparison between the strength of plaintiff's case and the offer made by defendant weighs strongly in favor of settling.

### C.  Complexity, Length and Expense of Litigation

"'Federal courts naturally favor the settlement of class action litigation.'"  *Wilkins*, 2015 WL 890566, at *4 (quoting *Isby*, 75 F.3d at 1196).  This is partially because class

---

[8] Plaintiff responded by distinguishing the cases cited by Stradtmann either in terms of litigation risk or posture.  (Mot. Final Approval (dkt. #88) 27-28.)

actions are complex and partially because settlement decreases both parties' litigation expenses and minimizes the demand for judicial resources.

While the Seventh Circuit has advised that it is not the court's place to "resolv[e] the merits of the controversy or mak[e] a precise determination of the parties' respective legal rights," *see Isby*, 75 F.3d at 1196-97 (internal citation and quotation marks omitted), plaintiff correctly noted that if the settlement was not approved, the continuing litigation would likely be very costly and protracted, with plaintiffs only seeing any potential recovery years in the future because of possible appeals. (Mot. Final Approval (dkt. #88) 16-17.) In contrast, the proposed settlement provides certainty and speedy resolution. As noted above, questions about class certification, liability, and damages would be complicated and time-intensive if this case progressed. This factor also weighs in favor of the settlement.

### D. Opposition to Settlement

The fact that there are only four timely objections and twenty-five opt-outs from a class of approximately 530,000 (Mot. Final Approval (dkt. #88) 2), "favors a finding that the settlement is fair, reasonable, and adequate under Rule 23."[9] *Capital One*, 80 F. Supp. 3d at 792 (noting that low opposition -- approximately 0.0032% of class members had opted out and there were only 14 objectors -- "favor[ed] a finding that the settlement is fair, reasonable, and adequate under Rule 23"); *see also Johnson v. Meriter Health Servs. Empl. Retir. Plan*, No. 10-cv-426-wmc, 2015 WL 13546111, at *3 (W.D. Wis. Jan. 5, 2015) ("Ultimately, one objection remains, which speaks volumes as to the fairness of the

---

[9] At a later point in the motion for final approval, plaintiff represented that twenty-six -- not twenty-five -- class members opted out, but the point is the same. (*See id.* at 22.)

proposed settlement in the class members' eyes."); *Ishy*, 75 F.3d at 1200 (finding district court had not abused its discretion in approving settlement despite 13% of the class submitting written objections); *but see Eubank*, 753 F.3d at 728 ("Contrary to the statement in [defendant's] brief, a low opt-out rate is no evidence that a class action settlement was 'fair' to the members of the class."). Here, approximately 0.0007% of the putative class objected and less than 0.005% opted out.

Likewise, the actual claims rate of 13.9% -- more than double the expected 5% rate -- supports finding that the settlement is fair. While Stradtmann had argued that the anticipated claims rate was reflective of the class members' view that the settlement was inadequate (Stradtmann Obj. (dkt. #66) 12-13), this does not warrant rejecting the settlement. *See Bayat*, 2015 WL 1744342, at *1-*2 (noting 1.9% claim rate for monetary relief and a 1.1% claims rate for injunctive relief; granting final approval in TCPA class action); *Capital One*, 80 F. Supp. 3d at 787 (7.87% claims rate). While the claimants will receive far less than their originally anticipated $200 payout, $70.80 is not a bad result, especially considering the claims at issue and the possibility that defendant could have escaped liability. *See Wright*, No. 14 C 10457, 2016 WL 4505169, at *8 (N.D. Ill. Aug. 28, 2016) ("[T]he $45 recovery per claimant is . . . in line with other TCPA settlements" (collecting cases)); *Bayat*, 2015 WL 1744342, at *5 ("A $151 payout here is a good result for the class members who filed claims, particularly given that [defendant] likely could have defensed this action either on the pleadings or at the class certification stage, leaving all class members with nothing."). Thus, this factor too weighs in favor of the settlement.

### E. Competent Counsel's Opinion

The opinion of counsel is also relevant to determine whether the settlement is fair, reasonable and adequate. *Capital One*, 80 F. Supp. 3d at 792. This inquiry is two-fold: (1) Is counsel competent? and (2) Is counsel in favor of the settlement? *See id.* ("The court accepts that Class Counsel in this case are experienced litigators, especially in the TCPA context, and that they strongly support the settlement. . . . [So] this factor weighs in favor of approval.").

According to plaintiff, class counsel "have significant experience in consumer privacy class action litigation, and have been appointed and served as class counsel in a similar TCPA case involving the transmission of allegedly unsolicited text message advertisements." (Mot. Final Approval (dkt. #88) 18.) Attorney Frank S. Hedin has worked at Carey Rodriguez Milian Gonya, LLP since 2014, where he has "investigated, initiated and prosecuted numerous consumer data-privacy cases." (Hedin Decl. (dkt. #51) ¶¶ 5-6.) He also served as class counsel in a TCPA class action in the Southern District of Florida. (*Id.* ¶ 7.) Attorney David P. Milian spent fifteen years before joining Carey Rodriguez working on litigation matters at Kozyak Tropin & Throckmorton, P.A.; over the course of his career he has represented federal and state class action plaintiffs. (Milian Decl. (dkt. #52) ¶¶ 4-5.) Recently, he "litigated numerous consumer data-privacy cases" and served as class counsel in the same Florida TCPA case as Mr. Hedin. (*Id.* ¶¶ 6-7.) Stradtmann criticized counsel as "attorneys with limited experience" because they served only as class counsel in two other TCPA cases. (Stradtmann Obj. (dkt. #66) 18 & n.13.) However, that disregards the years of litigation experience class counsel have. (*See* Hedin

Decl. (dkt. #51) ¶¶ 5-6; Milian Decl. (dkt. #52) ¶¶ 4-6.)

Because counsel is competent and "[b]oth Mr. Hedin and Mr. Milian strongly endorse the Settlement" (Mot. Final Approval (dkt. #88) 18), this factor also weighs in favor of the settlement.[10]

### F. Stage of Proceedings and Amount of Discovery at Settlement

The court also considers how far the litigation has progressed and how much discovery has been completed. *Capital One*, 80 F. Supp. 3d at 792. Here, plaintiff filed suit in May 2016 and requested preliminary approval of the settlement agreement in June 2017. In the interim, the parties filed an amended complaint; two answers; motions to (1) certify a class, (2) stay proceedings, and (3) to strike; supplemental briefing on a variety of issues; notices of supplemental authority; a stipulated confidentiality order; and joint discovery and pretrial deadline proposals. (*See generally Farnham* docket; Fees Req. (dkt. #61) 2.)

Plaintiff characterized discovery as "wide-ranging" and lasting for five months, during which counsel served discovery requests on Caribou Coffee and subpoenas on five third-parties, and hired a leading expert on cell phone technology and text message transmission, so counsel could "meaningfully assess the strength of the class claims and the risks posed by continued litigation." (Fee Req. (dkt. #61) 2, 22-23.) Following the settlement, counsel conducted a 30(b)(6) deposition of Caribou Coffee to determine the

---

[10] Unlike *Eubank*, plaintiff also points out that there are no red flags or evidence of collusion here, which further supports the settlement. (Mot. Final Approval (dkt. #88) 20-21.) The court agrees that the settlement here appears to have been the product of arms-length negotiation and is reasonable.

size of the settlement class.  (*Id.* at 24.)

The parties reached a settlement only following "ten hours of contentious, arms-length negotiations at mediation" with former Magistrate Judge Morton Denlow which they predicted would provide each class member who files a claim with approximately $200.[11]  (*Id.* at 2-3, 6.)  The settlement also provides for non-monetary relief: Caribou Coffee will cease marketing via text message, opting instead to use a downloadable application, and if it decides to use text messages in the future, it will (1) maintain "best practices policies and procedures that fully comply with the TCPA and related FCC regulations"; (2) train key personnel; and (3) improve its systems to avoid violating the TCPA.  (*Id.* at 3.)  Because this factor also weighs in favor of the settlement, all factors support the settlement.

## II. Motion for Award of Attorneys' Fees and Service Award

On September 30, 2017, class counsel and Farnham requested an award of attorneys' fees and a service award.  (*See generally* Fee Req. (dkt. #61).)  Class counsel asked for $2,712,747.70 as its fee, inclusive of out-of-pocket costs, which is equivalent to one-third of the settlement fund, after deducting the proposed administrative and notice costs

---

[11] However, as noted above, because of the higher-than-expected claim rate, this dollar value is reduced to approximately $70.80, based on counsel's request for attorneys' fees and incentive award for Farnham.  (Mot. Final Approval (dkt. #88) 3.)

and a $10,000 incentive award for Farnham.[12]  (*Id.* at 8.)  Objector Stradtmann objected

to both of these requests.  (Stradtmann Obj. (dkt. #66) 16-25.)

## A.  $10,000 Incentive Award for Farnham

An incentive award is "justified when necessary to induce individuals to become

named representatives." *In re Synthroid Marketing Litig.*, 264 F.3d 712, 722 (7th Cir. 2001)

(hereinafter *Synthroid*).  Likewise, where it is evident that the potential for recovery itself

is enough to incentivize plaintiffs to step forward, the market rate for incentive awards

would be zero.  *Id.* at 723.  Courts determining whether to authorize an incentive award,

and if so, an appropriate amount, may consider "'the actions the plaintiff has taken to

protect the interest of the class, the degree to which the class has benefited from those

actions, and the amount of time and effort the plaintiff expended in pursuing the

litigation.'" *Johnson*, 2015 WL 13546111, at *4 (quoting *Cook v. Niedert*, 142 F.3d 1004,

1016 (7th Cir. 1998)).  Within the Seventh Circuit, district courts have awarded incentive

awards totaling $5,000 to $25,000.  *Id.* (internal citations omitted); *see also Eubank*, 753 at

719 (noting that class representatives "receive modest compensation . . . for their normally

quite limited services").

Farnham argued that her involvement and initiation of this suit warranted a

---

[12] District courts are to compare the requested fee to the fee plus the moneys available for the class members -- administration and notice costs and service awards are not part of the moneys available for the class members. *Capital One*, 80 F. Supp. 3d at 795.  Counsel calculated its requested 1/3 correctly: ($8,500,000 - ($351,756.88 + $10,000))/3 = $2,712,474.71.  However, counsel's request does not take into consideration the updated administration costs: $8,500,000 - ($657,157.32 + $10,000) = $7,832,842.68; 1/3 x $7,832,842.68 = $2,610,947.56.

$10,000 incentive award: she sued on behalf of the class; she hired class counsel; she participated in discovery and provided information to class counsel; she submitted a declaration supporting a supplemental brief opposing Caribou Coffee's motion to stay; she remained informed about the case and regularly communicated with counsel; she reviewed and executed the settlement agreement; and ultimately obtained relief for the class. (Fee Req. (dkt. #61) 9.) The requested award falls on the lower half of the acceptable range. (*Id.* at 9-10 (collecting cases).) Stradtmann argued that Farnham's involvement was not significant enough to justify a $10,000 award, especially considering what Stradtmann viewed as the limited amount recovered for the class. (Stradtmann Obj. (dkt. #66) 23-25.)

Other courts in this circuit have determined that a $5,000 award was appropriate for a TCPA named plaintiff. *See Wilkins,* 2015 WL 890566 at *12; *Capital One*, 2015 WL 605203 at *19; *Wright*, 2016 WL 4505169, at *17. Ultimately, the court did *not* find a $10,000 incentive fee to be exorbitant and has approved it.

### B. Attorneys' Fees

Federal Rule 23 permits a court to award "reasonable attorney's fees" in a certified class action. Fed. R. Civ. P. 23(h). It is the court's responsibility to "balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Capital One*, 80 F. Supp. 3d at 788 (quoting *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989)). Class counsel who want certainty in their fees will come to the court at the outset for the court to determine their fee. *See Synthroid*, 264 F.3d at 719

("Many district judges have begun to follow the private model by setting fee schedules at the outset of class litigation . . . . Before the litigation occurs, a judge can design a fee structure that emulates the incentives a private client would put in place. At the same time, both counsel and class members can decide whether it is worthwhile to proceed with that compensation system in place."). Class counsel here did not do so.

In common fund cases in the Seventh Circuit, district courts can choose either a percentage approach or the lodestar method for calculating fees. *Americana Art China Co. v. Foxfire Printing and Packaging*, 743 F.3d 243, 247 (7th Cir. 2014). The goal is for the court to "approximate the market rate between willing buyers and willing sellers that would have prevailed had the parties negotiated the rate at the outset of the representation." *Capital One*, 80 F. Supp. 3d at 794-95 (concluding "arm's length negotiation . . . would have negotiated a fee arrangement based on a percentage of the recovery, consistent with the normal practice in consumer class actions").[13] The Seventh Circuit requires district courts to "do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Synthroid*, 264 F.3d at 718. This market rate is calculated based on (1) "the risk of nonpayment a firm agrees to bear," (2) "the quality of its performance," (3) "the amount of work necessary to resolve the litigation," and (4) "the stakes of the case." *Id.* at 721; *see also Capital One*, 80 F. Supp. 3d at 796 (To help estimate market fee, courts look to "(1)

---

[13] As the Seventh Circuit noted, "[o]nly *ex ante* can bargaining occur in the shadow of the litigation's uncertainty; only *ex ante* can the costs and benefits of particular systems and risk multipliers be assessed intelligently." *Synthroid*, 264 F.3d at 719.

actual fee contracts between plaintiffs and their attorneys; (2) data from similar common fund cases where fees were privately negotiated; and (3) information from class-counsel auctions." (citing *Synthroid*, 264 F.3d at 719)).  Where counsel has requested too high a fee, "[t]he simple and obvious way for the judge to correct [the problem] is to increase the share of the settlement received by the class, at the expense of class counsel." *Wright*, 2016 WL 4505169, at *14 (quoting *Pearson v. NBTY, Inc.*, 772 F.3d 778, 786 (7th Cir. 2014)) (alteration in original).

### 1. Fees Requested

Class counsel argued that because this is a "common fund" case, the court is permitted to establish the amount of attorneys' fees to be deducted from the settlement fund, under the theory that the class members should pay the fee, which should be determined at a market rate.  They argued that it was appropriate to use a percentage fee because consumer class actions, including TCPA ones, typically rely on contingency fee arrangements and plaintiff's retainer agreement provided for such an arrangement. (Fee Req. (dkt. #61) 12-13.)  Contingency fee arrangements typically provide for 30-40% of the recovery plus expenses.  (*Id.* at 14.)

Counsel's request for fees is not a model of clarity.  Specifically, counsel asked for one-third of the settlement fund, excluding the administrative costs and the incentive award (or $2,712,747.70, inclusive of out-of-pocket expenses), which they argued fell within the range of TCPA class action settlement market rates.  (*Id.* at 8, 12-13), but then urged the court to "find that thirty-percent of the Net Common Fund fairly and accurately represents the base market rate for a fee award in an $8.5 million common fund TCPA

settlement" (*id.* at 16). Counsel also argued that a total fee of 36% (the 30% base rate plus a 6% risk premium) would be appropriate. (*Id.* at 17.)

Counsel provided a summary of the hours and fees to permit a lodestar cross-check. (*Id.* at 27.) The base lodestar would be $520,833.75. (*Id.*) The requested bill of $2,712,747.70 is 4.86 times the base lodestar and expenses, or 5.2 times the base lodestar itself. (*Id.* at 29.)[14] Counsel argued that this was not unreasonable enough to deviate from the one-third market rate requested. (*Id.*)

Stradtmann, in addition to her objections discussed above, objected to the fees class counsel requested. (Stradtmann Obj. (dkt. #66) 17-23.) Specifically, her objections were that (1) the market rate for TCPA attorneys' fees is at most 20% (*id.* at 17); (2) the year's work during the pendency of this case did not entitle counsel to larger than market fees (*id.* at 19-22); and (3) because the TCPA provides for strict liability, the obstacles plaintiffs would need to overcome to establish liability at trial do not justify a 33% fee (*id.* at 22-23).[15]

### 2. Risk of Nonpayment

Counsel argued that the court should consider whether a risk premium is appropriate to compensate counsel for the risk at retention of not winning. (Fee Req. (dkt.

---

[14] Counsel incurred $36,392.81 in out-of-pocket expenses. (Fee Req. (dkt. #61) 28.) Considering the final settlement administration costs ($657,157.32) and the accordingly-reduced request, the multipliers are 5.01 times the base lodestar itself or 4.69 times the base lodestar and expenses.

[15] Stradtmann also argued that the results achieved did not entitle class counsel to larger than market fees. (Stradtmann Obj. (#66) 21-22.) This is not addressed in light of the discussion above regarding her objection to those results.

#61) at 16-17.) Counsel argued that the significant risk of no recovery warranted a 6% premium -- risks faced "includ[ed] the possibility that individualized issues of consent would preclude class certification and that shifting FCC interpretations and rulemakings would absolve the defendant of liability"; the intervening release of the Supreme Court's decision in *Spokeo*, which created questions whether statutory damages class actions would remain viable; the definition of ATDS, as challenged in *ACA Int'l.*; and the risk that this court would deny class certification or reduce the class award on the basis of Caribou Coffee's "excessive fines and due process" affirmative defense. (*Id.* at 17-18, 20.)

Class counsel overstated the risks of the litigation. Yes, the class faced serious -- but typical -- obstacles in a TCPA case: Caribou Coffee's affirmative defenses of consent and due process, as well as class management issues. Perhaps if there had been no history of similar cases counsel would be entitled to a 6% premium. Counsel, however, filed suit in 2016 and should have known that because of the threat of crippling liability, the defendant had a large incentive to settle before trial. *See Wilkins*, 2015 WL 890566 at *11. The potentially staggering liability proposed by the TCPA "is sufficient to compel an *in terrorem* settlement before a liability determination is made," which reduced counsel's risk of potential nonpayment. *Capital One*, 80 F. Supp. 3d at 805.

### 3. Quality of Representation & Work Necessary to Resolve Litigation

Counsel represented that 99% of the class received individualized Notice, as the settlement administrator contacted class members by mail, post, electronic publication and the settlement website. (Mot. Final Approval (dkt. #88) 10.) Counsel argued that "[t]he quality and amount of [their] work support[ed] a fee award of one-third of the Net

Settlement Fund inclusive of costs" because counsel thoroughly investigated the matter before bringing suit; prepared and filed the complaints; drafted and sent a comprehensive demand letter on Caribou and its marketing company; filed two motions to strike; negotiated a confidentiality order for discovery; and compiled additional briefing. (Fee Req. (dkt. #61) 21-22.) Counsel also engaged in the briefing, discovery, and mediation discussed above and had compiled a motion to compel outstanding discovery, which was never filed and mooted by the agreement to participate in mediation. (*Id.* at 22-23.) This work was necessary to resolve the litigation. The representation does not appear deficient, particularly in light of the proposed resolution. And to counsel's credit, a larger percentage of the class filed claims than anticipated.

### 4. Stakes

As referenced throughout this opinion, the stakes in this litigation were monetary damages for a statutory injury (receiving text messages allegedly without prior written consent) for the plaintiffs, at least some of whom argued they gave prior consent (Johnson Obj. (dkt. #60) 1; Guidarelli Obj. (dkt. #68) 1), and possible, but improbable, crushing statutory liability for defendant, which was not covered by insurance.

Counsel contended that "[t]ellingly, not a single other case related to this action was filed against Caribou, either before or after Plaintiff filed suit, thus suggesting that the high risk nature of these claims made the litigation undesirable to other counsel practicing in this area of law." (*Id.* at 21.) Perhaps that suggests that other counsel wouldn't take on the case due to the risk of nonpayment, or perhaps it suggests that other counsel would consider it frivolous and therefore would not take on the case. In either event, class counsel

had a lot at stake, with the risk of non-payment, advancing litigation costs, and opportunity costs attendant to accepting this case.

### 5. Market Rates

Inspired by the Seventh Circuit's consideration of empirical data regarding fee awards, the Northern District of Illinois analyzed 72 TCPA class action settlements and created a table detailing the mean and median fee percentages based on the recovery achieved. *Capital One*, 80 F. Supp. 3d at 796-97, 799. It found that the data revealed two insights: (1) "the across-the-board percentage awards in TCPA class actions roughly track the fee awards in other types of cases, after controlling for class recovery amount" and (2) "TCPA class actions exhibit the same relationship between fee awards and recoveries as other types of cases . . . the percentage of the fund awarded to counsel generally declines as the size of the fund increases." *Id.* at 799. The Northern District's calculations place a settlement of $8.5 million within the range of between $7 and $9.8 million, so that the mean fee percentage would be 25.8 and the median fee percentage would be 25.0. Stradtmann's argument that the market rate falls below 20% is unfounded.

Counsel argued that the retainer agreement entered into by counsel and plaintiff -- providing for a fee of 35-40% -- was representative of the type of agreement class members would have entered before the case was filed and was thus an appropriate *ex ante* assessment of the risks of litigation. (Mot. Final Approval (dkt. #88) 31.) However, this type of retainer is not particularly helpful in "determining the market rate because named plaintiffs are less often sophisticated buyers of legal services and more often the cat's paws of the class lawyers" and named plaintiffs lack "sufficient stake to drive a hard -- or any -- bargain

with the lawyer[s]." *Capital One*, 80 F. Supp. 3d at 796 (internal quotation marks and citations omitted; alteration in the original). However, counsel argued that they were the only counsel available to the class because no other firm stepped forward, indicating it could have bargained with the class to achieve the requested one-third. (Mot. Final Approval (dkt. #88) 32.) *See Aranda v. Caribbean Cruise*, No. 12 C 4069, 2017 WL 1369741, at *4-*5 (N.D. Ill. April 10, 2017) (finding a higher fee award was warranted because of the late settlement and "the relatively low level of interest from the plaintiffs' bar," which indicated counsel could have "bargain[ed] for a favorable fee").[16]

### 6. A 30% Fee, with a 3% Risk Premium Is Reasonable

The court agrees with counsel that a percentage-of-recovery method for calculating attorneys' fees is appropriate because normal practice in consumer class actions is to negotiate a contingency fee agreement at the outset of the litigation. *See Wright*, 2016 WL 4505169, at *14 (quoting *Capital One*, 80 F. Supp. 3d at 795). The lodestar method would require a greater level of monitoring of class counsel than plaintiffs would typically like to undertake. *Id.* Likewise, the class probably would not want to pay fees in advance. *Id.*[17]

Class counsel, having variously requested one-third, thirty-percent, and thirty-six percent, will get at least part of what they want. The court will award a 30% fee, with a 3

---

[16] However, note that *Aranda* had a larger settlement fund and thus was subject to the sliding-scale approach seen in *Capital One* and *Wilkins*. The sliding-scale approach is not appropriate here because the entire settlement fund is less than $10 million.

[17] The overwhelming preference of district courts in this circuit when confronted with a TCPA class settlement and request for attorneys' fees is to rely on the percentage-of-recovery method instead of the lodestar.

and 1/3% risk premium for a total fee of one-third of the net settlement fund. Thirty percent for the first $10 million seems to be the baseline rate in TCPA class actions, which courts have found reasonable. *Id.* at *14-*15 ("30% is an appropriate fee recovery in this case, where the net settlement fund is around $10 million."); *see Capital One*, 80 F. Supp. 3d at 804 (applying sliding-scale fee structure, with 30% fee on the first $10 million); *Wilkins*, 2015 WL 890566, at *10 (same); *see also In re Synthroid Marketing Litig.*, 325 F.3d 974, 980 (7th Cir. 2003) (awarding 30% on first $10 million in pharmaceutical case).

A risk premium is appropriate -- albeit not as high as requested by counsel -- because there was a non-negligible risk of nonpayment. As noted above, counsel faced serious, but typical, risks associated with a TCPA class action: defendant's affirmative defenses of consent and due process, as well as class management problems. Yet these risks were counterbalanced against the knowledge that the threat of crippling liability gave defendant a coercive reason to settle. *See Wilkins*, 2015 WL 890566, at *11 ("By 2014, therefore, Class Counsel knew or should have known that the incentives to settle, at least for large financial institutions that made millions of phone calls in alleged violation of the TCPA, would most likely overcome any incentives to litigate.") In most respects, this case was a typical TCPA class action, warranting no risk premium. *See Wilkins*, 2015 WL 890566, at *11 (declining to adjust the market fee to account for the level of risk in "an average TCPA class action" because the "serious obstacles for Plaintiffs to overcome in establishing liability" were "the typical obstacles faced by most TCPA plaintiffs). The one wrinkle is the reassigned number problem, which increases the risk of no recovery faced by counsel.

A three and one-third percent risk premium is reasonable.[18]

A total attorneys' fee of $2,610,947.56 (one-third of the net settlement fund) is reasonable.

## III. Motion to Prohibit Unauthorized Communications and to Disqualify Bandas[19]

The final matter before the court at the Fairness Hearing was plaintiff's motion to prohibit unauthorized communications with class members and to disqualify Bandas and the Bandas Law Firm. (*See generally*, Mot. Prohibit & Disqualify (dkt. #69).) As discussed below, this motion is denied.[20]

### A. Misleading Website

Plaintiff first argued that the Bandas Website "is remarkably deceptive and misleading in both appearance and substance." (*Id.* at 7.) She argued that the Bandas

---

[18] At the fairness hearing, Class Counsel drew the court's attention to two cases in which the Northern District of Illinois awarded a 36% fee to counsel in TCPA class actions. (*See* Notice of Judicial Decisions (dkt. #100).) *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 504-05 (N.D. Ill. 2015) (relying on *Capital One*) identifies similar "real and significant" risks of consent of class members, questions of manageability, and threat of revised interpretation of the TCPA, which were magnified by that court's prior dismissal with prejudice of plaintiff's complaint. *Id.* at 488. In *Grant v. Commonwealth Edison Co.*, No. 1:13-cv-08310 (N.D. Ill. 2015), plaintiff argued that his was not a "typical" TCPA case because the defendant presented a novel question about the applicability of the "emergency exception" in the TCPA. Pl.'s Mot. and Mem. of Law re: Approval of Atty's Fees at 26-27, *Grant v. Commonwealth Edison Co.*, No. 1:13-cv-08310 (July 23, 2015 N.D. Ill. 2015), ECF No. 58 (adopted by ECF No. 68). Having considered these cases, the court nevertheless concludes that a 3 and 1/3 percent risk premium is appropriate.

[19] Plaintiff and Objector Stradtmann spend much of their time addressing Bandas's conduct in other cases not before the court, which was much ado about nothing.

[20] Stradtmann filed a motion to strike plaintiff's reply or for leave to file a sur-reply related to this motion. (Dkt. #92.) The court denied the request to strike, but granted permission to file a sur-reply, which had already been filed with and considered by the court at the time of the fairness hearing. (*See generally* Sur-Reply (dkt. #93).)

Website (1) mimics the claims submission website; (2) lacks "any indicia of advertising"; and (3) "contains several false and misleading statements": (a) that the deadlines under "IMPORTANT DEADLINES FOR FILING CLAIMS" were the October 13, 2017 deadlines for objections and exclusion, but not the claim-filing deadline; and (b) that the website advises "CLASS MEMBERS MUST ACT BEFORE OCTOBER 13TH TO PRESERVE ALL THEIR LEGAL RIGHTS," followed in small font that claims must be filed by November 13.  (*Id.* at 7-11.)

Stradtmann responded, arguing first that "[t]his motion is frivolous in its entirety." (Stradtmann Resp. (dkt. #71) 3.)  She continued that class counsel's complaints about the Bandas Website "are unfounded": (1) the website identifies itself as "Legal Advertisement"; (2) the website correctly lists the claims deadline of November 13, 2017 six times and is not misleading; (3) immediately preceding the bolded statement "IMPORTANT DEADLINES FOR FILING CLAIMS," are two paragraphs detailing the claims deadline; (4) the website provides links to the settlement website; (5) informing class members that they must act before October 13 is not misleading because those that did not object or seek exclusion by that date waived their rights to do so; and (6) the text under the heading warning about October 13 was not "fine print."  (*Id.* at 6-7.)

Looking at the website, it does not appear misleading.  Correct information is available and the website repeatedly links to the settlement website, as well as to the settlement agreement and the notice.

## B. Rules of Professional Conduct

Next, plaintiff argued that Bandas violated multiple rules of professional conduct.

First, plaintiff argued he "makes various material misrepresentations" on his website, "most notably by providing incorrect information concerning the deadlines and other requirements" for filing a claim, as well as neglecting to inform class members that they are represented already by class counsel.[21]   (Mot. Prohibit & Disqualify (dkt. #69) 13.) Second, Bandas inappropriately targeted class members despite knowing of their attorney-client relationship with class counsel, even after being retained by Stradtmann and after October 13, 2017.[22]   (*Id.* at 14-16.)   Third, plaintiff argued Bandas was attempting to communicate with and retain clients (unnamed class members) who were actually adverse to Stradtmann who opposed the proposed settlement.[23]   (*Id.* at 16-17.)

---

[21] Plaintiff alleged this violated Rule 20:7.1: "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services.  A communication is false or misleading if it:

    (a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;

    (b) is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the Rules of Professional Conduct or other law; or

    (c) compares the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated; or

    (d) contains any paid testimonial about, or paid endorsement of, the lawyer without identifying the fact that payment has been made or, if the testimonial or endorsement is not made by an actual client, without identifying that fact."

[22] Plaintiff opined that Bandas acted in this manner "for the apparent purpose of finding Settlement Class members to use to object to Class Counsel's fee request by the November 20, 2017 deadline." (Mot. Prohibit & Disqualify (dkt. #69) 15.)   Notably, however, no objections, other than those identified above, were made by Bandas-represented objectors or otherwise.

Plaintiff alleged this was a violation of Rule 20:4.2(a), which provides: "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."

[23] Plaintiff asserted that this was a violation of Rule 20:1.7, which provides: "(a) Except as provided in par. (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:

Stradtmann responded that there was no ethical violation. First, that "Rule 20:7.1 [was] facially inapplicable because the Bandas website does not make false communications *about the Bandas Law Firm or Mr. Bandas*." (Stradtmann Resp. (dkt. #71) 10-11 (emphasis added).) Second, that "[t]he Bandas website also [did] not violate Wisconsin Rule 20:4.2" because (1) Stradtmann, when she contacted the Bandas Law Firm, was not represented by class counsel because she contacted the firm before the opt-out date;[24] (2) the Bandas website is "static" such that it does not seek out individuals, meaning it is not a communication;[25] and (3) if it were a communication, it would be permitted under Comment 4 of Rule 4.2, which permits communication with a represented person who is seeking advice from a lawyer not already representing a client in the matter. (*Id.* at 11-13.) Finally, that the Bandas Law Firm's only client in this matter is Stradtmann. (*Id.* at

---

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under par. (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in a writing signed by the client."

[24] *See In re Katrina Canal Beaches Consol. Litig.*, No. 05-4182, 2008 WL 4401970, at *3 (E.D. La. Sept. 22, 2008) ("A client-lawyer relationship with a potential member of the class does not begin until the class has been certified and the time for opting out by a potential member of the class has expired." (quoting ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 07-445, at 3 (2007))).

[25] (*See* Cade Decl. (dkt. #74) ¶¶ 24-31.)

15.)

In reply, plaintiff expanded on her argument that the Bandas Website is false and misleading, adding to her argument that the website "misrepresent[s]" deadlines and procedures that it "misrepresents" the services of the Bandas Law Firm

> by omitting . . . (a) that Bandas has no role or Court-authorized involvement whatsoever with the settlement; (b) that the only service Bandas offers in connection with the Settlement is the preparing and filing of objections to the Settlement; (c) that Carey Rodriguez Milian Gonya, LLP has already been appointed by the Court to provide legal services for benefit of the Settlement Class; and (d) that a Settlement Class member need not provide information to Bandas . . . in order to file a Claim.

(Pl.'s Reply (dkt. #82) 5-6.)  Further, at deposition, Stradtmann testified that a Facebook advertisement led her to the Bandas Website, which plaintiff argued was solicitation.  (*Id.* at 2, 6-8.)  Plaintiff also argued that the continued operation of the Bandas Website after the exclusion deadline was improper solicitation of represented parties, who were "directly adverse to Ms. Stradtmann."  (*Id.* at 7.)

Plaintiff's arguments about the misrepresentations on the Bandas Website are unfounded.  The Bandas Website states that "[t]o receive a share of the settlement fund, class members must file a claim on the settlement website or complete a claim form and email it or mail it no later than November 13, 2017."  It provides multiple hyperlinks to the settlement website.  It includes a "summary" of the proposed legal fees and expenses, referring to "the attorneys for the class" and "Class counsel."  A fair reading of this information is that the Bandas Law Firm is not class counsel, and a different firm is involved.  Plaintiff's concerns about the website are overblown.

As to the targeted Facebook advertisement, while it seems less static than a simple website, as to Stradtmann there was no problem since Bandas had no other client and the exclusion deadline had not yet passed; and as to other class members after the exclusion deadline, even if represented by class counsel, they were able to hire their own counsel to object to the settlement or to class counsel's fees.

## C. Requested Relief

Plaintiff asked for an order (1) requiring the removal of the Bandas Website; (2) prohibiting communication with unnamed class members without permission from the court or class counsel; (3) requiring class counsel be informed if non-Stradtmann class members had communicated with Stradtmann's counsel; and (4) requiring documents referring to or constituting communication with class members. (Mot. Prohibit & Disqualify (dkt. #69) at 19.) Plaintiff concluded by requesting the disqualification of Bandas and his law firm. (*Id.*)

Stradtmann responded that this court lacked jurisdiction to order the Bandas Website be taken down or to address any possible ethical violations because Bandas had not made an appearance in this matter, which would implicate, at minimum due process rights. (Stradtmann Resp. (dkt. #71) 16.) Further, she argued that class counsel should not be permitted to end-run the discovery process through its motion, but rather must litigate its subpoena in the Southern District of Texas; yet, even so, all of the material requested is privileged or work product. (*Id.* at 16-17.) She also argued that class counsel failed to justify their request for disqualification. (*Id.* at 14-15.)

There was no reason to prohibit communication by Bandas with members of the

class.  The challenged communications on the Bandas Website are benign and thus not an appropriate basis to restrict communication.  *See In re Katrina Canal Beaches Consol. Litig.*, 2008 WL 4401970, at *3 ("[T]o the extent that the district court is empowered . . . to restrict certain communications in order to prevent frustration of the policies of Rule 23, it may not exercise the power without a specific record showing by the moving party of the particular abuses by which it is threatened." (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 (1981) (alteration in original)); *id.* at *4 ("'[I]t is not enough that a potentially coercive situation exists . . . .  While actual harm does not have to be shown, there must be some evidence that justifies an interference with defendant's speech.  The Court cannot issue an order without evidence that a potential for serious abuse exists." (quoting *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2002 WL 272384, at *3 (E.D. La. Feb. 25, 2002) (alteration added)).[26]  Plaintiff failed to make this showing.[27]

   While plaintiff provided evidence indicating that Bandas is a serial objector who files the same or similar objections in similar suits (Mot. Final Approval (dkt. #88) 29 n.6

---

[26] In *Katrina Canal*, the court *did* partially grant plaintiffs' motion limiting communications of defendant and its agents, such that communications must provide a written summary of the claims in the case, inform putative class members that the action was pending, advise them that they may join the suit, and to contact the litigation committee for more information.  *Id.* at *5.  Further, class members could not be influenced about whether to join or bring a separate suit, and the names and addresses of those contacted must be filed, with the contactor providing certification that he complied with the order.  *Id.*  Plaintiffs had alleged that defendant's investigators had recorded interviews and "evaded questions about whom they represented or affirmatively lied about their employment."  *Id.* at *1.  The facts there, however, are distinguishable.

[27] Plaintiff's subpoena request for information from the Bandas Law Firm is apparently being litigated in the Southern District of Texas, as represented by counsel during a telephonic hearing held before Judge Crocker on November 17.  Even if it were troubled by Bandas' conduct in this case, this court sees no reason to duplicate the litigation in that court.

(citing cases rejecting Bandas arguments for awarding damages to class members based on the number of phone calls received)) -- the objections submitted on Stradtmann's behalf by local counsel, Miller & Ogorchock, S.C., raised concerns worth considering, even if ultimately rejected -- disqualification or the other relief requested would be inappropriate on this record.

Accordingly, plaintiff's motion is DENIED.

Entered this 15th day of December, 2017.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge